**FIRST DIVISION**
**PHIPPS, C. J.,**
**ELLINGTON, P. J., and MCMILLIAN, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**September 10, 2014**

# In the Court of Appeals of Georgia

A14A1018. ALSTON v. THE STATE.

A14A1019. PERKINS v. THE STATE.

MCMILLIAN, Judge.

Kelton Alston and Chance Perkins were tried together before a jury and each was convicted of aggravated assault, armed robbery, theft by receiving, cruelty to children, criminal street gang activity[1] and possession of a firearm during the commission of a crime. They filed separate motions for new trial, which the trial court denied. Alston and Perkins then filed separate, timely notices of appeal, which were docketed in this Court as A14A1018 and A14A1019, respectively. We consolidated their cases for review and now affirm.

---

[1] See Georgia Street Gang Terrorism and Prevention Act, OCGA § 16-15-1 et seq.

Construed to support the verdict,[2] the evidence shows that Alston, Perkins and Quadell Leonard[3] traveled from New Jersey to Georgia on March 31, 2009, for a visit. They initially stayed at an apartment on Six Flags Drive with Darien White and his girlfriend, Teranisha Posey, who Perkins claimed was his relative. White testified that appellants and Leonard told him they were members of the Bloods street gang, that they wore red clothing and bandanas as proof of their membership, and that they talked of committing robberies and other crimes to make money to go back to New Jersey.

White testified that he left his apartment for a while on April 4, 2009, and that when he returned home he discovered that his belongings had been rearranged and that his handgun had been taken. White reported the gun stolen at that time. White encountered the defendants later that day at a nearby apartment complex and asked for his "property" back. The defendants started to run away, but one of them turned around and fired White's gun in his direction, striking his vehicle. White called police again to report the shooting incident. White testified he saw Perkins the next day at

---

[2] *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

[3] Alston, Perkins, and Leonard will be collectively referred to as "defendants," and Alston and Perkins will be collectively referred to as "appellants."

a gas station, and Perkins pulled up his shirt to show White that he still had his handgun.

Brittany Dawn Baker testified that on April 5, 2009, she was waiting at the bus stop outside Six Flags amusement park ("Six Flags") with her friend Iya Akinsaye when three men wearing "red big jewelry going around their necks" walked up and began talking to them. Baker testified that the men said they wore the beads to "represent" the Bloods and that they all had numerous tattoos on their bodies.

Baker testified that a "nice" car turned in the lane near them, and one of the men ran up to the car, but it pulled away. He rejoined the group and remarked, "I could have had her, I could have had her," and touched what appeared to be a gun under his shirt. Baker said the two other men were behind him but also walked toward the car, and when he touched his waist, they also repeated, "yeah, yeah, we could have had her, we could have had her."

Baker said that a few minutes later, the man with the gun looked up toward the bridge that passes over Six Flags Drive and then tapped one of the other men on the shoulder, seeming to indicate "come on this way," and the men left together. Baker testified that about five or ten minutes after the men left, a man and a young boy walked up to them from the direction of the bridge the men had walked toward and

3

said that they had been robbed. She said the boy was crying and the man appeared distressed and scared and asked to use a cell phone so he could call the police.

Paul Santos Rivera ("Santos")[4] testified that he and his five-year-old son went to Six Flags on April 5, 2009. He and his son left the park around 5:00 p.m., and were walking to a nearby gas station to meet his wife who was picking them up there. However, before they reached the gas station, three men came up to him, and one of them pointed a gun at his head and demanded that he drop his valuables. Santos put his Play Station Portable, cell phone, and money on the ground, and the perpetrators picked up the items and then walked away laughing. Santos further testified that he saw the gunman, and possibly the other two perpetrators, talking to a girl at a bus stop outside Six Flags when he and his son passed by there on the way to the gas station, and that shortly after they passed the bus stop, he heard footsteps behind him and feared something bad was about to happen.

Santos said that he walked back to the bus stop to borrow a cell phone so he could call police, and he borrowed a phone from one of the women he had seen talking to the perpetrators to call 911. A short time later, defendants were

---

[4] It appears that this victim commonly goes by Paul Santos instead of Paul Rivera and we will refer to him as "Santos."

4

apprehended in a nearby neighborhood based on the information police received from several 911 calls.

Leonard entered a guilty plea prior to trial, and was called by the State as a witness. Leonard testified that he and appellants were members of different divisions of the Bloods gang in New Jersey and that Alston's nickname was "Grimy Red," Perkins's nickname was "Little Hellbound," and that his nickname was "Big Hellbound." He also admitted he had tattoos that showed his gang affiliation, that he wore red and black beads, and that a red bandana he wore signified that he was a Bloods gang member.

Although Leonard acknowledged that he initially told police that appellants participated in the theft of White's gun and the armed robbery, Leonard testified at trial that he acted alone in these crimes and that he had lied in his earlier statements. He also admitted that he wrote a letter to Alston while they were in prison in which he admitted he had violated gang rules by "snitching" on appellants and that he also wrote a letter in which he told Alston he was going to tell his lawyer that he had lied when he had implicated appellants in the crimes.

Additional evidence will be set forth as necessary to address appellants' specific claims of error.

1. Turning first to Alston's enumerations of error, Alston argues that the State failed to prove the necessary nexus between the alleged criminal street gang violation and the predicate crimes of aggravated assault and armed robbery as alleged in the indictment. See *Rodriguez v. State*, 284 Ga. 803, 807 (1) (671 SE2d 497) (2009). It is true that our Supreme Court has held that a conviction under OCGA § 16-15-4 (a) requires that there "be some nexus between the [predicate] act and an intent to further street gang activity." Id. However, we disagree that the State failed to present sufficient evidence of the necessary nexus in this case.

First, we note that Alston does not appear to challenge the sufficiency of the evidence to support his convictions for the predicate offenses underlying the gang charges. Further, the evidence presented at trial[5] overwhelmingly established that defendants were associated with various divisions of the Bloods criminal street gang. Alston argues, however, that no evidence was presented concerning his New Jersey gang criminal activity and no evidence was presented that the crimes that were

---

[5] This evidence included, but was not limited to, appellants' and Leonard's statements to police and/or others, Leonard's testimony at trial, and evidence that defendants wore gang colors, had numerous tattoos indicating Bloods gang membership, and wrote or received letters in prison containing gang slang and symbols.

committed in Georgia were related to or in furtherance of their New Jersey gang activity. However, the State presented expert testimony that the Bloods is a national gang and that the regional or local subsets of the gang use many of the same identifying markers, such as tattoos or renderings of five sided objects and the colors red and black. The record is replete with evidence that defendants continued to wear these identifying colors once they arrived in Georgia and that they in fact were wearing colors signifying their Bloods gang affiliation at the time they committed the armed robbery.

Additionally, White testified that defendants talked about their gang membership from the time they arrived in Georgia, and they talked about "what they wanted to do while they [were here], like robberies and trying to make some money to get back home. Pretty much anything, I guess, what they do up in New [Jersey] where they are from, I guess." Further, Baker testified that the defendants talked about their gang affiliation just minutes prior to robbing Santos, that they were wearing red and black beads, and that they made statements indicating they wore their gang colors to "represent."

The State also presented testimony from an expert on gangs, who said that it would be a violation of the Bloods gang "bylaws" to wear a rival gang's colors during

7

the commission of a crime and that the gang's reputation is furthered by committing highly visible crimes in a manner which allows the witnesses and the victims to discern that a particular gang committed the crime. Further, communications recovered from defendants' jail cells shows that they continued to communicate about the crimes after they were apprehended and incarcerated and that Leonard wrote a letter to Alston acknowledging he had committed a violation of gang rules by implicating his fellow gang members in the crimes. Additionally, evidence was also presented that shortly after he was arrested he told police that he "can't give names because of these" and pointed to the gang tattoos on his hands and wrist. This and other evidence presented at trial was sufficient to establish that the crimes here were related to and in furtherance of defendants' Bloods gang affiliation. *Jones v. State,* 318 Ga. App. 26, 30 (1) (b) (733 SE2d 72) (2012); *In the Interest of C. P.*, 296 Ga. App. 572, 576 (675 SE2d 287) (2009).

2. Alston also contends that the trial court erred by denying his motion to sever.

> A trial court's decision to deny a motion to sever will be affirmed absent an abuse of discretion. The defendant moving for severance has the burden of making a clear showing of prejudice and of a denial of due process in the absence of severance. Indeed, in satisfying this burden, a defendant must do more than simply assert that he would have a better chance of acquittal if he were tried separately.

8

(Citations and punctuation omitted.) *Jones v. State*, 277 Ga. App. 185, 186 (626 SE2d 142) (2006). Further, the trial court applies the following factors in deciding a severance motion:

> (1) whether the number of defendants will create confusion as to the evidence and the law applicable to each, (2) whether there is a danger that evidence admissible against one defendant will be considered against the other despite the court's instructions, or whether the strength of the evidence against one defendant will engulf the other with a "spillover" effect, and (3) whether the defendants' defenses are antagonistic to each other or to each other's rights.

(Citations omitted.) Id. at 186-187. See also *Herbert v. State*, 288 Ga. 843, 845 (2) (708 SE2d 260) (2011).

Alston contends that the trial court should have severed his trial based on the second factor, arguing that he was prejudiced by being tried with Perkins because of his visible gang-related tattoos. In support of this contention he points to the fact that a large number of potential jurors had to be excused for cause "just based on the viewing of the co-defendant" Perkins. But the transcript of the voir dire proceedings belies Alston's assertion that this was the reason a large number of jurors were excused. The transcript shows that 11 potential jurors were excused for cause, but that the majority of jurors who were excused said they had formed an opinion or were

9

biased because the appellants had been charged with numerous crimes, or other reasons unrelated to Perkins' tattoos.[6] And of the four jurors who did indicate that Perkins' tattoos, or even more generally appellants' appearance, would affect their impartiality, one juror stated that her bias against Perkins would not "spillover" over to Alston, and another juror indicated that his impartiality might not spillover to Alston.

Moreover, and importantly, these jurors were properly questioned and excused outside the presence of the other potential jurors, thus removing any potential influence their biased opinion might have had on the jury's deliberations. Further, the trial court specifically charged the jury to "deliberate separately as to each defendant and return a separate verdict as to each defendant . . . . And I charge you that though you may consider all the evidence as a whole, conviction of one defendant does not necessarily require conviction of the other. You, the jury, must determine the guilt or the innocence of each defendant separately."

Lastly, testimony and photographs were admitted that showed that all three defendants had gang tattoos, and such evidence was admissible and relevant to

_____

[6] Another potential juror was questioned after she indicated possible bias but ultimately was not excused. In any event, this juror did not indicate any possible prejudice toward either appellant because of their appearance.

10

establish defendants' association with a criminal street gang. See *Jones v. State*, 318 Ga. App. at 30 (1) (b) (OCGA § 16-5-3 (2) clearly contemplates that existence and membership in a criminal street gang may be established by evidence of tattoos, among other things). Thus, the chance of spillover based solely on the jury viewing Perkins' facial gang tattoos was minimal. Accordingly, the trial court did not abuse its broad discretion in denying Alston's motion to sever. E.g., *Moon v. State*, 288 Ga. 508, 509 (2) (705 SE2d 649) (2011); *Herbert*, 288 Ga. at 845 (2); *Jones*, 277 Ga. App. at 187-188.

3. In his final enumeration of error, Alston contends that the trial court erred by allowing the State to play the recording of the 911 calls received after the armed robbery because two of those witnesses did not testify at trial. Also, Alston asserts that the res gestae exception to the hearsay rule does not apply because the information the caller provided about the crime was the product of afterthought or reflection, the caller did not witness the crime, and part of the information the caller provided came from a person talking to her in the background during the call.

Statements that are made during a 911 call, including statements identifying the perpetrator of a crime, while the incident is on-going and the perpetrator is still at large with the purpose of enabling the police to meet an on-going emergency are

11

not testimonial in nature. *Glover v. State*, 285 Ga. 461, 462 (2) (678 SE2d 476) (2009); *Thomas v. State*, 284 Ga. 540, 542 (2) (668 SE2d 711) (2008); *Landaverde v. State*, 305 Ga. App. 488, 491 (2) (699 SE2d 816) (2010). "Once a determination is made that a statement is nontestimonial in nature, normal rules regarding the admission of hearsay apply. Thus, the statements were admissible if they qualified under one of Georgia's hearsay exceptions." (Citations and punctuation omitted.) *Thomas*, 284 Ga. at 543-544 (2). Here, the trial court admitted the statements under the res gestae exception, which is frequently used in this state to admit recordings of 911 calls that are made during the commission of a crime. *Thomas*, 284 Ga. at 544.

Whether the res gestae exception, formerly codified at OCGA § 24-3-3,[7] applies depends on factors such as "(i) the timing of the statement (ii) whether the declarant was able to deliberate about the statement and (iii) whether the declarant was influenced by others prior to making the statement. Additionally, there must be some evidence to show that the declarant had personal knowledge regarding the facts delivered in the statement and was not merely relaying information he had obtained

---

[7] The trial of this case occurred in 2010, well before the effective date of Georgia's new Evidence Code. We note, however, that the new Evidence Code does not use the term "res gestae." See OCGA § 24-8-803; *Johnson v. State*, 292 Ga. 785, 789 (4), n. 4 (741 SE2d 627) (2013).

12

from another person." (Citations and punctuation omitted.) *Thomas*, 284 Ga. at 544 (2).

Four 911 calls about the armed robbery were received within minutes of the crime. The first and third calls were from Amber McClendon.[8] In the first call, McClendon indicated that she had seen a "man getting robbed in front of his kid" and that "he had a gun pointed in his face." She also said that there were three male perpetrators, that the victim was Hispanic, and that the perpetrators were black. She also gave a description of the clothes two of the perpetrators were wearing. McClendon indicated that she was reporting the crime because the victim did not have a phone and was upset. McClendon called back about five minutes later, and reported that she had seen the perpetrators in a nearby subdivision, where they were ultimately apprehended.

The second call was from Iya Akinsaye, who was one of the women defendants had been talking to at the bus station. Akinsaye also reported that someone had just been robbed, and gave a description of the men, including the fact that they were from New Jersey and had on red and black beads. The 911 operator asked her how many

---

[8] McClendon indicated that she called immediately but had been on hold for about five minutes.

guns were involved and she asked a man in the background the question,[9] whose

audible response Akinsaye relayed to the operator. Akinsaye also indicated to the 911

operator that the victim had asked her to call.

The fourth call was from Santos, who said he had just been robbed. He also

indicated to the 911 operator that someone had already called on his behalf to report

the crime because he did not have a phone. At that point, the police arrived, and

Santos did not give the operator any additional information.

We find no error in the admission of the recording of the 911 calls under these

facts. The calls were obviously made immediately after the robbery, while the robbers

were still at large and for the purpose of securing police assistance for the victims and

helping the police catch the perpetrators. McClendon's statements indicate she

witnessed the crime, and even if Akinsaye did not witness the crime, she saw the

perpetrators leave the bus stop to follow Santos and his son. Further, it was clear, as

the trial court noted, that the person speaking to her in the background during the 911

call was Santos. Thus, the information she gave the 911 operator was based either on

her own observations of the defendants which occurred just immediately prior to

when they robbed Santos or the information Santos, who testified at trial, provided

---

[9] The caller referred to the person as "sir."

14

her during the call. "A trial court's determination that evidence is sufficiently informative and reliable as to warrant being considered as part of the res gestae will not be disturbed on appeal unless the ruling is clearly erroneous." *Thomas*, 284 Ga. at 544 (2). Based on the foregoing, we conclude that the trial court properly determined that the recording of the 911 calls were admissible under the res gestae exception. This enumeration thus affords no basis for reversal. E.g., *Glover*, 285 Ga. at 463 (2); *Thomas*, 284 Ga. at 544 (2); *Landaverde*, 305 Ga. App. at 491 (2).

*Case No. A14A1019*

4. Perkins also argues that the State failed to prove the necessary nexus to establish the criminal street gang violation and that the trial court erred by allowing the recording of the 911 calls to be played for the jury. However, for the reasons stated in Divisions 1 and 3 above, these contentions are without merit.

5. Perkins also contends that his trial counsel was ineffective because he failed to have Perkins' tattoos covered for trial and because he failed to move for a mistrial after the jury was clearly prejudiced by seeing his tattoos.

The standard for judging an ineffectiveness claim is well known and need not be belabored here. To prevail on his ineffectiveness claim, Perkins "must show counsel's performance was deficient and that the deficient performance prejudiced

15

him to the point that a reasonable probability exists that, but for counsel's errors, the outcome of the trial would have been different." *Myers v. State,* 275 Ga. 709, 713 (4) (572 SE2d 606) (2002). "This burden, although not impossible to carry, is a heavy one." (Citation and punctuation omitted.) *Hicks v. State*, 295 Ga. 268, 275 (3) (___ SE2d ___) (2014).

Appellants' trial counsel testified at the motion for new trial hearing that they discussed the issue of covering Perkins' tattoos and that they agreed that it might look to the jurors like they were hiding something or being "sneaky." Further, they said they believed that covering the tattoos would be of little benefit since the photographs of Perkins' facial and other tattoos would most probably be admitted at trial. Thus, Perkins' counsel testified that he made a strategic decision not to attempt to cover the tattoos.

"Judicial scrutiny of counsel's performance must be highly deferential. For this reason, the law recognizes a strong presumption that counsel performed reasonably, and the defendant bears the burden of overcoming this presumption. In particular, decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." (Citations and punctuation omitted.) *Hicks v. State*, 295

16

Ga. at 276 (3). In light of all the attendant circumstances here, we find that Perkins' trial counsel's strategic decision in regards to Perkins' tattoos was not so patently unreasonable that no reasonable attorney would have taken this course of action.[10] And because counsel did not render deficient performance by failing to attempt to conceal Perkins's facial tattoos from the jury, it is unnecessary for us to consider the second prong of *Strickland*.[11] E.g., *White v. State*, 293 Ga. 825, 826 (2) (750 SE2d 165) (2013) ("If a defendant fails to meet his burden on one prong of the two prong test, then the other prong need not be reviewed by the Court.").

*Judgments affirmed. Phipps, C. J., and Ellington, P. J., concur.*

---

[10] Perkins' contention that his trial counsel should have moved for a mistrial "after the jury was clearly prejudiced by seeing" his tattoos likewise fails.

[11] *Strickland v. Washington*, 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984).