**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**April 13, 2015**

# In the Court of Appeals of Georgia

A14A1783. ZAMUDIO v. THE STATE.

A14A2023. GONZALEZ v. THE STATE.

BARNES, Presiding Judge.

Antonio Jesus Zamudio and Carlos Gonzalez were jointly indicted, tried, and convicted of attempted murder, aggravated assault, aggravated battery, and a violation of the Georgia Street Gang Terrorism and Prevention Act, OCGA § 16-15-1 et seq. The attempted murder, aggravated assault, and aggravated battery charges served as the predicate offenses for the criminal street gang count pursuant to OCGA § 16-15-4 (a), which makes it "unlawful for any person employed by or associated with a criminal street gang to conduct or participate in criminal street gang activity through commission of any offense enumerated in paragraph (1) of Code Section 16-15-3." Both men appeal the denial of their respective motions for new trial, asserting that the evidence was insufficient to affirm the gang activity convictions.

Zamudio also contends that the indictment for aggravated assault was void and that the trial court erred in denying his motion to sever, in admitting testimony about pictures seen on the Internet, in failing to give his requested charge on simple assault, and in merging the aggravated battery conviction into the attempted murder conviction instead of vice-versa. We conclude that the evidence was sufficient and find no merit in any of Zamudio's enumerations of error except as to the merger issue. Thus, we affirm the judgments of conviction in both cases. We agree with Zamudio, however, that the trial court erred in merging his aggravated battery conviction into his attempted murder conviction, and thus vacate both appellants' sentences in part and remand their cases for resentencing.

1. Construed in the light most favorable to the verdict, the evidence at trial established that Gonzalez, Zamudio, and the victim grew up in a neighborhood that was known to be the territory of a local street gang, the Surenos 13. The victim moved in 2009 to a neighborhood called "Little Mexico," which was known to be the territory of a rival gang, the Tiny Winos. Zamudio and Rosalio Jacobo went to the victim's house in April 2011, called him out, and asked him to "hang out" with them, but the victim said no and went back inside his house. Zamudio and Jacobo were not happy about the victim's response, which Zamudio described as "messed up."

2

A few days later, Zamudio called the victim, who knew it was Zamudio calling from the caller I.D. and declined to answer. The victim walked outside around 1:00 a.m. to smoke a cigarette, and Zamudio, Gonzalez, and Jacobo approached his porch, calling for the victim to come out to them. The victim "had a bad feeling," but they said a mutual friend was with them and wanted to talk. The victim had not seen the friend in about two years, so he came down from his porch to say hello. The friend and victim shook hands and had friendly conversation, then Gonzalez approached the victim saying "gang stuff" about "Sur 13" and arguing about Surenos and Winos. Gonzalez said he thought the victim wanted to call the police and get him in trouble, and then Gonzalez punched the victim. The victim knocked Gonzalez down and their mutual friend pulled them apart. The friend thought the fight was over and got in his car to leave.

Zamudio told the victim that he had changed and should not "be like how he was on Friday and stuff" because they had grown up together. Gonzalez ran up and punched the victim again, and as they struggled, Zamudio joined in, kicking the victim two or three times. The friend saw that the fight had re-ignited and returned to the scene, because it was no longer one-on-one since Zamudio had joined Gonzalez in fighting the victim.

The victim testified that after he knocked Gonzalez down the second time, Gonzalez got up and said he had a gun, but the victim's glasses had been knocked off so he could not see what was in Gonzalez's hand. Someone else said "no, no" in response to Gonzalez's threat about the gun, then Zamudio handed Gonzalez a box cutter and Gonzalez slashed the victim's throat. After Gonzalez cut the victim's throat, the victim wrestled the cutter away and tried to toss it, but Zamudio got on top of the victim, took the cutter away, and gave it back to Gonzalez. After the fight ended, the friend saw Gonzalez "reach down into his pant leg," retrieve the box cutter, and put it in his sock. Jacobo saw something drop and heard a "metal kind of sound." The friend gave the victim his shirt, told him to wrap it around his neck, and drove him to the hospital, where the victim received multiple stitches to close the wound in his neck.

Although neither Zamudio nor Gonzalez challenges the sufficiency of the evidence as to the charges of attempted murder, aggravated assault, and aggravated battery, we conclude that the evidence as summarized above was sufficient to enable a rational trier of fact to conclude beyond a reasonable doubt that they were guilty of those crimes. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

4

2. Zamudio and Gonzalez do challenge the sufficiency of the evidence as to their conviction for gang activity. The indictment charged them with the offense of

> PARTICIPATION IN CRIMINAL GANG ACTIVITY for that said accused . . . did, being associated with a criminal street gang, to wit: Surenos 13, participate in criminal gang activity through the commission of . . . a criminal offense . . . that involves violence, to wit: aggravated assault, aggravated battery, battery and simple battery when said accused possessed a cutting device in the presence of [the victim], cut [the victim's] neck, grabbed [the victim] and struck [the victim], contrary to the laws of said State, the good order, peace and dignity thereof.

To prove that Gonzalez and Zamudio violated the Street Gang Act as charged, the State was required to show three things: (1) that they were, in fact, associated with a "criminal gang," (2) that they committed a predicate act of "criminal gang activity," namely the aggravated assault, aggravated battery, battery, and simple battery upon the victim, and (3) that the commission of the predicate act was intended to further the interests of the "criminal gang." See *Rodriguez v. State*, 284 Ga. 803, 806-807 (1) (671 SE2d 497) (2009). See also OCGA § 16-15-4 (a).

While Gonzalez admitted being a member of Surenos 13, he argues that the State failed to prove that his assault on the victim was intended to further the interests

5

of the gang. Zamudio argues the evidence was insufficient to prove he was even associated with Surenos 13.

OCGA § 16-15-3 (2) defines "criminal street gang" as "any organization, association, or group of three or more persons [that] engages in criminal gang activity" as defined by subsection (1) of the statute. "Criminal gang activity" includes the commission or attempted commission of certain offenses, including any crime "that involves violence, possession of a weapon, or use of a weapon. OCGA § 16-15-3 (1) (J). Finally, OCGA § 16-15-4 (a) makes it unlawful to participate in criminal gang activity through the commission of any of the offenses listed in OCGA § 16-15-3 (1), which include racketeering, stalking, rape, aggravated sodomy, possessing or distributing dangerous instrumentalities such as knives and guns, posting gang-related graffiti, or committing any criminal offense involving violence or the possession or use of a weapon, among other things.

The State may prove the existence of a criminal gang "by evidence of a common name or common identifying signs, symbols, tattoos, graffiti, or attire or other distinguishing characteristics, including, but not limited to, common activities, customs, or behaviors." OCGA § 16-15-3 (2). A detective assigned to the Conasauga Safe Streets Task Force, operated by the FBI to control gang activity in the area,

6

testified both as an expert on gang recognition and as to the facts he uncovered through his investigation of this case. He explained the difference between "traditional" gangs, which have a structured hierarchy with a leader and regular meetings where members pay dues, and "hybrid" gangs, which branched off of the traditional gangs and had no set hierarchy or rules.

The detective explained that Surenos 13 was a hybrid gang that initially developed in the California prison system from a traditional gang and then migrated into other states, including Georgia. Three major hybrid Hispanic gangs operated in the Dalton area: Surenos 13, Tiny Winos, and Fifth Avenue. Each gang operated in its own territory. Surenos 13 territory was the Amberfield subdivision, where Zamudio, Gonzalez, and the victim grew up, and Tiny Wino territory, or "Wino Land," was located in the south end of the county. The Little Mexico area where the victim lived was a Tiny Wino "hangout."

The detective also described in detail the symbols and colors that indicated someone's gang membership. He further testified that the "driving force" behind the local gangs was "to be top dog, to be the biggest and baddest," which was accomplished by "showing force" and "taking on all challengers." For example, he explained, if a gang member confronts a rival gang member, by saying something as

simple as, "Throw down," or "I'm Sur 13. What's up?," the rival must "act and ... show heart" to earn respect from his gang. An individual who is alone and is confronted must still "show who [he is] in order to keep [his] reputation. Because word gets around quickly."

a. Zamudio argues that the State failed to prove his association with Surenos 13 beyond a reasonable doubt, having shown only that he was with Gonzalez, who was associated with the gang. Zamudio correctly notes that the fact that he grew up and still lived in a neighborhood that was Surenos 13 territory does not, by itself, establish his association with the gang, nor does the fact that he was with admitted gang member Gonzalez when he returned to the victim's house. However, the circumstantial evidence about growing up and still living in Surenos 13 territory was relevant to whether he was a gang member, as was the detective's testimony that he had seen 40 to 50 photographs from about 2006 to 2008 that showed Gonzalez, Zamudio, Jacobo, and others in front of the Amberfield neighborhood sign while Gonzalez and another man made gang signs for Surenos 13. Zamudio admitted that he had kicked the victim during the fight, which Gonzalez started after talking about "gang stuff" and the two rival gangs, and as discussed earlier, the State introduced evidence that Zamudio handed Gonzalez the box cutter that slit the victim's throat.

8

The evidence presented was sufficient to authorize the jury to find that Zamudio was a member of Surenos 13. See *Rodriguez*, 284 Ga. at 809 (participation with others in criminal gang activity implies knowledge of gang activities and intent to further gang's criminal purposes).

b. Gonzalez admitted being a Surenos 13 member but argues that the State failed to prove that the fight was undertaken to further the gang's interest. He contends that the only evidence related to the gang was the victim's testimony that Gonzalez was talking about "gang stuff" and mentioned Surenos 13 before instigating the fight, and asserts that this evidence is insufficient to establish that he acted "on behalf of" the gang when he fought with the victim.

The victim, however, was not the only one who testified that Gonzalez began talking about the gang before he started fighting the victim. After Gonzalez and Zamudio lured the victim from his porch by saying the mutual friend wanted to talk to him, the friend testified that the five of them were standing around when Gonzalez started arguing about "gang-related stuff, about Surenos and Winos," and then began the fight.

Gonzalez told the detective later that the victim did not "gang bang anymore" but that the victim used to be a member of the Tiny Winos, and the victim testified

9

that when he was in middle school he been "put . . . down as affiliated" with the Tiny Winos because he had contacts with members of that gang. While Gonzalez denied going to Little Mexico on a "gang banger" mission, saying that if he had, he would have brought his gang with him, he went to the victim's house attended by two other men in addition to the mutual friend.[1]

As noted, the detective testified that gangs like Surenos 13 placed great importance in being "the biggest and the baddest" and by showing force, and that a gang member had to respond to being disrespected by the member of another gang or his reputation would suffer. When Zamudio and Jacobo went to the victim's house to ask him to "hang out" with them, the victim, who had been associated with the Tiny Winos and lived in Tiny Winos territory, said no and went inside his house. Zamudio and Jacobo did not like the victim's response to their overture.

The detective testified that the term "jumped" was often used to indicate two or three people fighting one person, and that "jumped would be in itself a gang act. It's often used by gang members to describe what they do to other people." A few days after the unsuccessful overture toward the victim who was previously affiliated

---

[1]While Jacobo testified he was not a Surenos 13 member, the detective testified that he had seen many pictures of Jacobo, Zamudio, Gonzalez, and others in front of the Amberfield subdivision sign while some of them made gang signs.

with a rival gang, Zamudio, Jacobo, and Gonzalez lured the victim from his porch, Gonzalez began talking about Surenos 13 and Tiny Winos, and then he punched the victim. During a lull in the fight, Zamudio chastised the victim for his response to Zamudio's previous overture to hang out, and Gonzalez hit the victim again. This time Zamudio joined in. The mutual friend, who was in his car preparing to leave, got out and came back to help the victim because the fight was no longer one-on-one.

To sustain a conviction for "criminal gang activity" under OCGA § 16-15-4 (a), which prohibits gang members from participating in gang activity by committing one of the enumerated offenses such as aggravated assault, the State must show "some nexus between the enumerated act and an intent to further . . . gang activity." (Citation and punctuation omitted.) *In the Interest of C. P.*, 296 Ga. App. 572, 575 (675 SE2d 287) (2009). Simply being a gang member and committing the offense is not enough. But here, the State introduced evidence from which a jury would be authorized to find a nexus between the defendants' actions in seeking out and beating up the victim and their intent to further gang activity by ensuring that the gang responded strongly to the victim's disrespect of a gang member's offer of association. See *Wolfe v. State*, 273 Ga. 670, 674 (4) (d) (544 SE2d 148) (2001) (State linked evidence of gang activity to motive for crime and hierarchy of gang); *In the Interest*

11

*of X. W.*, 301 Ga. App. 625, 629-630 (3) (688 SE2d 646) (2009) (evidence juvenile told detective he began fighting rival gang member to get "his rank back up" after a "disrespect or violation issue" sufficient to establish participation in gang activity).

Accordingly, we find that the evidence presented was sufficient to authorize a reasonable jury to conclude that Gonzalez participated in criminal gang activity that furthered the interests of a criminal gang. *In the Interest of X. W.*, 201 Ga. App. at 629-630.

3. Zamudio contends that the trial court erred in denying his motion to sever his trial from Gonzalez's and in failing to sua sponte give a limiting instruction when similar transaction testimony was introduced against Gonzalez. The State never introduced the similar transaction evidence, however, and therefor this enumeration fails.

The State filed a notice of its intent to introduce similar transaction testimony related to a prior offense in which Gonzalez was accused of six counts of criminal trespass and violating the Street Gang Terrorism and Prevention Act, and that he pled guilty to the criminal trespass charges. During the similar transaction hearing before trial began, the State proffered that evidence would show that the criminal trespass charges arose after Gonzalez slashed the tires on six different vehicles, that he plead

12

guilty to those charges, and that he had admitted being a member of Surenos 13 and that he was with other gang members when he slashed the tires. Additionally, both the former and present offenses involved a cutting instrument. In the present case, the issues were whether Gonzalez was a member of the gang and whether the predicate acts were committed in furtherance of that gang membership, and allowing the similar transaction evidence would assist the State in proving knowledge and intent in the present case. Zamudio argued that if they court granted the motion, then it should sever his trial from Gonzalez's because such evidence "would irreparably harm Mr. Zamudio's defense in this case."

In ruling that the similar transaction evidence was admissible, the trial court noted that Gonzalez had argued in his opening statement that the activity at issue in the current trial was not gang activity, and that, based on its proffer, the State would be able to establish that the similar transaction evidence was offered "for the purpose of establishing elements of this particular crime in this particular case that could otherwise be non-gang activity." The trial court further held that the evidence "tends to prove this element [of gang activity for] the offense charged in this particular case, that it cannot easily be established by other evidence, and that the prejudicial effect

13

does not outweigh the propriety of using the evidence." The court also denied Zamudio's motion to sever.

a. *Motion to Sever*. Defendants who are jointly indicted for crimes in which the State does not seek the death penalty "may be tried jointly or separately in the discretion of the trial court." OCGA § 17-8-4 (a). We review the trial court's denial of a motion to sever for an abuse of discretion. *Rhodes v. State*, 279 Ga. 587, 590 (3) (619 SE2d 659) (2005).

> In ruling on a severance motion, the court should consider: (1) the likelihood of confusion of the evidence and law; (2) the possibility that evidence against one defendant may be considered against the other defendant; and (3) the presence or absence of antagonistic defenses. And the burden is on the defendant requesting the severance to do more than raise the possibility that a separate trial would give him a better chance of acquittal. He must make a clear showing that a joint trial would lead to prejudice and a consequent denial of due process.

*Nwakanma v. State*, 296 Ga. 493, 498 (3) (___ SE2d ___) (2015).

"In this case, there was little likelihood of jury confusion, as there were ultimately only two defendants and there was no difference in the law applied to either of them." *Kitchens v. State*, 296 Ga. 384, 387 (3) (___ SE2d ___) (2015). Further, evidence that Gonzalez was a gang member would have been admissible

against Zamudio in a separate trial under OCGA § 16-15-9, which provides that "[t]he commission of any offense enumerated in paragraph (1) of Code Section 16-15-3 by any member or associate of a criminal street gang shall be admissible in any trial or proceeding for the purpose of proving the existence of the criminal street gang and criminal gang activity."

Finally, Zamudio cannot show prejudice because the State did not introduce any evidence about the similar transaction. Instead, the State called a detective to the stand and asked him a total of four questions, eliciting the response that in 2010, Gonzalez had admitted being a Surenos 13 gang member. Neither defendant cross-examined the witness. Not only was this not similar transaction evidence, it was also cumulative of evidence from the detective who investigated the crime at issue, who also testified that Gonzalez had always admitted he was a member of the gang. Thus we find no error in the trial court's denial of Zamudio's motion to sever.

b. *Limiting jury charge*. Absent the introduction of similar transaction evidence, the trial court could not have erred in failing to give a contemporaneous limiting instruction, Further, even if the State had introduced similar transaction evidence, a trial court commits no error in failing to give limiting instructions absent

15

a request to do so. *State v. Belt*, 269 Ga. 763, 764 (505 SE2d 1) (1998). Accordingly, we find no merit to this enumeration.

4. Zamudio argues that the trial court erred in allowing the investigating detective to testify over objection about photographs he had seen posted on the Internet site Myspace several years before the assault at issue in this case. We review a trial court's evidentiary rulings for abuse of discretion. *Hinton v. State*, 280 Ga. 811, 816 (4) (631 SE2d 365) (2006).

Zamudio filed a motion in limine, seeking to bar the detective from testifying that he had seen pictures of Zamudio "while surfing the Internet" unless the State produced the images themselves. The trial court deferred ruling until the issue arose at trial.

The detective testified that when the FBI gang task force started in 2005 and 2006, local street gangs often posted information online about where they were going to be that night. It was commonplace for one gang to "say something derogatory to another gang and the other gang would say, 'Well, meet me here at the mall at this time,' " so task force members would go to that location to make sure the gangs did not confront each other. The detective testified that he had seen these postings on the

16

website Myspace, which the gangs did not use much any more, favoring Facebook and Twitter, and when he attempted to look for them, they were no longer available.

When the State asked the detective whether he had seen "photographs that concerned Amberfield," Zamudio objected, arguing that he anticipated that the detective was going to testify that he had seen Zamudio and possibly Gonzalez also "in some sort of a visual image," but that without requiring the State to establish a foundation for the admission of the actual images, Zamudio was unable to test their authenticity. The trial court overruled the objection, and the detective testified that between 2006 and 2008, he saw 40 to 50 photographs of people posing in front of the brick Amberfield Subdivision sign, including Zamudio, Jacobo, Gonzalez, and a man named Flores, with the latter two making Surenos 13 "gang signs."

Zamudio argues on appeal that the State should have been required to produce the photographs or web pages themselves under the Best Evidence Rule, while conceding that former OCGA § 24-5-4, which was applicable to this trial, did not generally apply to photographs or recordings. Assuming that the objection made at trial was sufficient to raise a best evidence objection, we find no error. Photographs were not considered writings under former OCGA § 24-5-4, and were therefore not subject to the best evidence rule. See *Smith v. State*, 236 Ga. 5, 8 (2) (222 SE2d 357)

(1976) (holding that the best evidence rule did not apply to a photograph of a police lineup).

Zamudio also argues that the detective's testimony was inadmissible hearsay. It was not. See *Smoot v. State*, 316 Ga. App. 102, 108 (3) (729 SE2d 416) (2012) (testimony describing photographs on web pages was not hearsay).

5. Zamudio asserts that Count 3 charging him with aggravated assault is fatally defective because it fails to allege the elements necessary to charge him with a crime. The count alleged that Zamudio committed the crime of aggravated assault

> for that the said accused [on a particular date in a particular county] did commit an act, to wit, possess a cutting device in the presence of [the victim], said device being an object which when used offensively against another person is likely to result in serious bodily injury, which placed . . . [the victim] in reasonable apprehension of immediately receiving a violent injury. . . .

Zamudio argues that the count is insufficient because it charges him only with possessing a cutting device and not with using it in some manner that placed the victim in reasonable fear of violent injury. Under the Code, aggravated assault has two essential elements: (1) an attempt to commit a violent injury, or an act that places

18

another in reasonable apprehension thereof, and (2) that the assault was aggravated by either (a) an intention to murder, rape or rob, or (b) the use of a deadly weapon." *Smith v. Hardrick*, 266 Ga. 54, 55 (2) (464 SE2d 198) (1995) (indictment fatally deficient because charged defendant only of placing his hands around victim's neck). The aggravated assault count against Zamudio charges him with the precise elements of the crime as they are defined by OCGA §§ 16-5-20 (a) (2) and 16-5-21 (b) (2), "and was sufficiently definite to advise [him] of what he must be prepared to confront." *Johnson v. State*, 286 Ga. 432 (687 SE2d 833) (2010).

6. Zamudio asserts that the trial court erred in failing to give his requested jury charge of simple assault as a lesser included offense of aggravated assault. Simple assault is an element of aggravated assault, with the aggravating element being the use of an offensive weapon. *Adams v. State*, 264 Ga. 71, 76 (9) (440 SE2d 639) (1994), overruled in part on other grounds in *Carr v. State*, 281 Ga. 43 (635 SE2d 767) (2006). Whether the trial court was required to give a requested charge on simple assault depends on the evidence. *Edwards v. State*, 264 Ga. 131, 133 (442 SE2d 444) (1994); *Pierce v. State*, 301 Ga. App. 167, 174 (5) (687 SE2d 185) (2009). Zamudio argues that the jury could have found that Zamudio did not use the box cutter that sliced the victim's neck offensively if the jury considered only the victim's

19

testimony that Zamudio took the box cutter away from the victim. Similarly, he argues, the jury could have believed that Zamudio possessed the box cutter at some point during the fight because he was trying to break up the fight rather than because he wanted to use it against the victim.

> "[A] written request to charge a lesser included offense must always be given if there is any evidence that the defendant is guilty of the lesser included offense. But . . . where the evidence shows either the commission of the completed offense as charged, or the commission of no offense, the trial court is not required to charge the jury on a lesser included offense.

*Gilliam v. State*, 237 Ga. App. 476, 478-479 (2) (517 SE2d 348) (1999).

Here, no evidence supports Zamudio's hypothetical version of how the jury might conclude he was guilty of simple assault rather than aggravated assault or nothing. If he possessed the box cutter only when he took it away from the victim while breaking up the fight, then he was not guilty of any form of assault. This enumeration is without merit.

7. Finally, Zamudio contends that the trial court erred in merging his aggravated battery conviction into his attempted murder conviction, instead of merging the murder into the battery. He argues that both of these convictions were

20

based on the same conduct, possessing and using a box cutter to cut the victim's neck. The only difference between the two crimes is that attempted murder requires a less serious injury than aggravated battery, because the crime of attempted murder does not require the State to prove any injury to the victim.

Whether offenses merge is a legal question, which we review de novo. *Louisyrs v. State*, 307 Ga. App. 724, 730 (2) (706 SE2d 114) (2011). Under OCGA § 16-1-6 (2), one crime is included in another if the former "differs from the crime charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest … suffices to establish its commission." Our Supreme Court has held that the crime of

> battery, which prohibits the intentional infliction of bodily injury, is included in a crime such as murder, which prohibits the intentional infliction of more serious bodily injury, i.e., death, despite the distinction between these two injury elements. Similarly, it is clear that the only difference between aggravated battery and murder is that the former requires a less serious injury to the person of the victim, as the injury to a bodily member specified in the aggravated battery statute is obviously less serious than death. Therefore, . . . convictions for both offenses established by the same conduct are prohibited by OCGA § 16-1-6 (2).

21

*Ledford v. State*, 289 Ga. 70, 74 (1) (709 SE2d 239) (2011). See *Soilberry v. State*, 289 Ga. 770, 773 (3) (716 SE2d 162) (2011).

Here, the trial court did merge the two offenses, but it merged the conviction that required the greater injury — aggravated battery — into the conviction that required the lesser injury — attempted murder — instead of the other way around. The State concedes that, under the rationale of *Hernandez v. State*, 317 Ga. App. 845, 852 (3) (733 SE2d 30) (2012), the attempted murder would merge into the aggravated battery because in *Hernandez* we determined that "attempted murder requires a less serious injury to the person, as personal injury is not a required element of attempted murder. See OCGA §§ 16-4-1, 16-5-1 (a).: Id. But the State further urges us to reconsider our holding in that case based on OCGA § 16-1-6 (2)'s direction to consider the severity of the *risk* of injury from the underlying offenses as well as the severity of the actual injury. Of course, the risk of injury from the crime of attempted murder is greater than the risk of injury from the crime of aggravated battery. We decline to revisit our holding in *Hernandez*, however, finding its analysis to be sound.

Accordingly, we must vacate Zamudio's sentence for attempted murder and remand his case to the trial court for resentencing in accordance with this opinion.

Further, although Gonzalez did not enumerate as error the merger of his aggravated battery conviction into his attempted murder conviction, "a judgment of sentence is void where it imposes an illegal sentence, i.e., a sentence that the law does not allow, and . . . the illegality of such a judgment is not a waivable issue." *Hulett v. State*, 296 Ga. 49, 54 (2) (766 SE2d 1) (2014) (sentence in which trial court erroneously merged convictions vacated even though neither party appealed sentencing errors). It is true that an appellate court has no duty "to scour the record searching for merger issues." *Nazario v. State*, 293 Ga. 480, 487-488 (2) (c), (d) (746 SE2d 109) (2013). But

> [w]here a case challenging criminal convictions is properly brought before a court and the court realizes, on its own or based on the defendant's argument, that the record shows that certain convictions merged, to disregard that determination and allow the defendant to serve a sentence for a criminal conviction that has been identified as illegal and void would not comport with fundamental fairness and due process of law.

Id. We therefore also vacate Gonzalez's sentence in part and remand his case for resentencing in accordance with this opinion.

*Judgments of conviction affirmed, sentences vacated in part, and cases remanded. Boggs and Branch, JJ., concur.*

23