**SECOND DIVISION**
**ANDREWS, P. J.,**
**MILLER and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**November 13, 2015**

# In the Court of Appeals of Georgia

A15A1024. RANDOLPH v. THE STATE.

BRANCH, Judge.

Based on his sworn testimony during a prior murder trial, a jury found Davan Randolph guilty of distributing marijuana, conspiring to distribute marijuana, and violating the Georgia Street Gang Terrorism and Prevention Act. Randolph appeals, arguing that his prosecution was barred by procedural double jeopardy, the state engaged in selective prosecution, venue was not proven, and there was insufficient evidence of the gang crime. We affirm the drug convictions, but reverse the gang activity conviction.

Viewed in a light favorable to the verdict,[1] the record shows that on August 29, 2006, a Camden County residence burned down and authorities discovered the body

---

[1] See *Falay v. State*, 320 Ga. App. 781, 781 (740 SE2d 738) (2013).

of Michael Ryan Foley, who had lived there with several roommates, in the remains. Foley had been shot to death before the fire. Special Agent Richard Dial of the Georgia Bureau of Investigation, the lead investigator on the case, soon learned that Foley was a marijuana seller who had scheduled a drug deal for the morning of August 29. Dial and other agents tried "to find out who the deal was with and track that because those are the last people we believe had been present with [Foley] prior to his death."

Dial interviewed two of Foley's roommates, Josh Bordelon and Richard Allen Wessinger, and prepared summary reports that he later turned over to the prosecutor. Bordelon told Dial that on August 28, the night before the fire, Foley had said that a former neighbor, along with two of the neighbor's friends, wanted to buy a pound of marijuana and were planning to come over on the morning of August 29 to complete the transaction. According to Bordelon, the prospective buyers wished to sample the marijuana first, so Foley rode around in their car and smoked a "blunt" with them the night of August 28. Foley reportedly told Bordelon that he was uneasy about the pending deal because "the buyers wished to pay more than the going rate for the marijuana."

Wessinger gave a similar account. He told Dial that upon arriving home on the night of August 28, he saw a car with two black males inside pulling out of the driveway.[2] Wessinger said that Foley was standing in the driveway as the car was backing out and that Foley later told him that the men wanted to buy a pound of marijuana from him. According to Wessinger, Foley said that "he did not know the boys but knew one of the boy's brother." Foley's girlfriend also told Dial that Foley had told her he "didn't really know" the people involved in the pending deal.

Through further investigation, Dial identified Randolph as the former neighbor and "brother" to whom Bordelon and Wessinger had referred. Inside Randolph's car, authorities found a slip of paper with Foley's cell phone number written on it. Foley's cell phone records showed that he had received multiple calls on August 28 from the residences of two of Randolph's girlfriends. Several people told Dial that they had seen Foley sell small amounts of marijuana to Randolph in the past.

Randolph was arrested and charged with murder, armed robbery, arson, and gun possession. He was not charged with any drug or gang-related crimes. After the arrest, Dial took pictures of Randolph's chest, which bore several tattoos

---

[2] Wessinger later testified that he did not know who was in the car.

characteristic of the Folk Nation gang. Randolph – who was then in his thirties – told Dial that he had gotten the tattoos a long time ago.

Randolph testified at trial in his own defense. He said that he had met Foley 11 months before his death, smoked marijuana with him, and regularly bought small amounts of the drug from him for personal use. Randolph said that he had introduced other people – some of whom he knew and some of whom he did not know – to Foley as potential customers. Randolph explained that he had also helped Foley deliver marijuana: "[I]f I had friends that wanted some and I was already, going to get some and me and a friend of mine were planning to get together or something I would . . . go ahead and get theirs and take it to them." Finally, Randolph testified that Foley would bring his marijuana and scales to Randolph's girlfriend's house, where he and Foley "would weigh it up and we would put it in bags." According to Randolph, Foley would repay him for this assistance with approximately $25 worth of marijuana.

Randolph testified that he used to belong to the Folk Nation gang and that he had introduced Foley to some fellow gang members, or "brothers," who then bought marijuana from him. Randolph said that these people – not him – were the ones who arranged to buy a large quantity of marijuana from Foley, met with him on the night

of August 28, and killed him and burned the house the next day. Randolph, however, refused to name the men. When asked the reason for his silence, he responded, "Did you see what they did to [Foley]? Do you think I'm going to let them do that to me and my family? Do you think I'm going to call these people's names?" The jury found Randolph not guilty of all charges.

The state then brought a new indictment against Randolph charging him with four crimes based on his testimony in the first trial: (1) conspiracy to distribute marijuana, in that he had "put Ryan Foley in contact with other persons . . . for the purpose of distributing marijuana"; (2) conspiracy to distribute marijuana, in that he had weighed and packaged marijuana for the purpose of distribution; (3) distribution of marijuana, party to a crime, in that he had aided and abetted Foley by packaging marijuana for distribution and contacting purchasers; and (4) violation of the Georgia Street Gang Terrorism and Prevention Act, in that he had been associated with a gang and participated in gang activity by distributing marijuana. Randolph moved to dismiss the indictment on the ground that it violated the procedural double jeopardy protections in OCGA § 16-1-7 (b), which prohibits multiple prosecutions arising from the same conduct. The trial court denied the motion. Randolph also moved to dismiss

5

on the ground that he was the victim of selective prosecution in retaliation for his acquittal in the first trial, but the trial court apparently denied this motion as well.

The case proceeded to trial, and the state called two witnesses – Dial and the assistant district attorney who had prosecuted the first case. Dial testified that Randolph was not charged with any drug distribution crimes in his first trial because at that point, "all we had information was that Davan Randolph had purchased small amounts of marijuana." It was not until Randolph took the stand during the first trial that Dial learned that he had "been more involved in Ryan Foley's marijuana deals" and had introduced prospective customers – including gang members – to Foley. Dial further testified that Randolph was not charged with any gang crimes in his first trial because Dial "didn't have any knowledge that he was using gang affiliation to distribute drugs until he testified during the first trial."

The assistant district attorney who prosecuted the first case likewise testified that no drug or gang charges had been brought against Randolph at that time because he had no information to support such charges. The assistant district attorney also stated that the first time he learned that Randolph had introduced buyers to Foley, packaged marijuana for distribution, and actively associated with gang members was

6

when Randolph testified at the first trial. Excerpts from Randolph's testimony at the first trial were read aloud to the jury.

Randolph again took the stand in his own defense. He testified that he had joined the Folk Nation gang for self-protection years ago while he was in prison in Tennessee, but was no longer an active gang participant. Randolph moved to Georgia in 2005, lived with relatives, and worked a variety of jobs. He testified that one day he was playing basketball and wearing a tank top that revealed his tattoos when some men recognized the tattoos, approached him, identified themselves as members of Folk Nation, and asked if Randolph was also affiliated with the gang. Randolph said that he told the men he was "retired." Randolph encountered the men again later, and they asked him, "[Y]ou know anybody who got some bud because we can't find any." At that point – two months before Foley's murder – Randolph arranged a meeting between Foley and the men. Randolph claimed that he did not know the men well and did not regularly associate with them. Randolph also claimed that he believed the men were "just weed smokers just like me" who wanted small quantities of marijuana for personal use; "they weren't buying for the gang." According to Randolph, the men "just happened to be gang members. But this wasn't like you're buying five or ten pounds for the gang . . . to make money off of it. . . . [T]his wasn't a gang issue."

7

After the close of the evidence, the trial court instructed the jury that Randolph had raised a double jeopardy defense, that his prosecution would be barred if the crimes charged in the second indictment were known to the proper prosecuting authority at the commencement of the first trial, and that the jury had to decide "what facts the prosecutor knew" at that time. The jury was given a special verdict form asking if "any or all o[f] this prosecution is barred by Double Jeopardy." After deliberating, the jury answered the question in the negative and found Randolph guilty on all four counts. For the purpose of sentencing, the trial court merged counts one and two with count three and sentenced Randolph to ten years on the drug crimes and fifteen years on the gang crime, to run consecutively. Randolph filed a motion for new trial, which the court denied. This timely appeal followed.

1. Randolph contends that the trial court erred by denying his motion to dismiss the indictment on procedural double jeopardy grounds. "The procedural aspect of the double jeopardy rule prohibits multiple prosecutions arising from the same conduct." *White v. State*, 284 Ga. App. 805, 806 (644 SE2d 903) (2007) (citation and punctuation omitted). OCCGA § 16-1-7 (b) requires the state to prosecute crimes in a single prosecution "[i]f the several crimes arising from the same conduct are known to the proper prosecuting officer at the time of commencing the prosecution and are

8

within the jurisdiction of a single court." "A second prosecution is barred under OCGA § 16-1-8 (b) (1) if it is for crimes which should have been brought in the first prosecution under OCGA § 16-1-7 (b)." *Nicely v. State*, 305 Ga. App. 387, 388 (1) (699 SE2d 774) (2010) (citation and punctuation omitted). Randolph argues that his second prosecution is barred because the state was aware of his marijuana distribution and gang crimes before the first trial.

To prevail upon his motion to dismiss, Randolph bore the burden of showing that the prosecutor had actual knowledge before the first prosecution of the facts supporting the charges in the second prosecution. Id.; see also *Billups v. State*, 228 Ga. App. 804, 807 (1) (b) (493 SE2d 8) (1997) ("The prosecutor's knowledge of all the *facts* determines whether a single prosecution is required.") (emphasis in original). The trial court concluded that what the prosecutor knew before the first trial was a question of fact that should be resolved by the jury rather than by the court as a matter of law. See *Daniels v. State*, 78 Ga. 98, 103 (2) (1886) (fact questions related to applicability of double jeopardy defense "would have to be submitted to the jury"); *Harris v. State*, 193 Ga. 109, 117 (17 SE2d 573) (1941); compare *Bell v. State*, 249 Ga. 644, 645 (1) (292 SE2d 402) (1982) ("No question of fact was at issue in this special plea in bar [asserting double jeopardy], so it was unnecessary to have a jury

9

hear the plea."). Randolph has failed to show that he was entitled to judgment as a matter of law on his double jeopardy defense.

At the second trial, the state presented evidence that before the first trial, the only information it had about Randolph's involvement in marijuana distribution was witness statements that he had previously bought small quantities of marijuana from Foley and had arranged, along with two other men, to buy a pound of marijuana from Foley on the morning of the murder.[3] These witness statements did not demand a finding, as a matter of law, that the prosecutor had actual knowledge that Randolph had committed the crimes of conspiring to distribute marijuana and distributing marijuana. With regard to the gang crime, there was evidence that the state knew only that Randolph had joined a gang years before, not that he was currently involved in drug-related gang activity. Under these circumstances, the trial court did not err by

---

[3] In his appellate brief, Randolph also refers to a statement that Dial took during the murder investigation from a Mr. Griffith or Griffin, who supposedly implicated Randolph in marijuana distribution. Randolph provides no citation to the statement, and it does not appear to be part of the appellate record. Therefore, we are unable to consider it. See *Parker v. State*, 283 Ga. App. 714, 717 (2) (d) (642 SE2d 111) (2007) ("factual assertions in briefs that are unsupported by the record cannot be considered in the appellate process") (citation and punctuation omitted).

denying Randolph's motion to dismiss on double jeopardy grounds.[4]

2. Randolph argues that the trial court erred by denying his motion to dismiss based on selective prosecution because he was "the only one prosecuted for a drug offense after the murder trial of Ryan Foley" even though the evidence at the first trial showed that many other witnesses had committed drug crimes. Even assuming these factual assertions are accurate,[5] Randolph failed to establish a claim of selective prosecution.

> A defendant has the burden of proving, by the weight of the evidence, that his prosecution represents an intentional or purposeful discrimination which is deliberately based upon an unjustifiable standard, such as race, religion, or other arbitrary classification. A

---

[4] Although the state does not raise this argument on appeal, we question whether the drug charges in the second indictment arose from the same conduct as the charges in the first indictment. In determining whether multiple offenses arose from the same conduct, courts should consider whether they involved the "same parties, circumstances, locations, and times." *Morgan v. State*, 220 Ga. App. 198, 199 (469 SE2d 340) (1996) (citation and punctuation omitted). The drug activity to which Randolph admitted at the first trial, and which formed the basis for the second indictment, predated the planned one-pound drug deal between Foley and the people who killed him and involved different people and different quantities of marijuana in different locations.

[5] The record in this appeal does not contain the transcript from the first trial, and Randolph has cited no evidence to substantiate his assertion that no one else was prosecuted for drug crimes.

11

showing that others were not prosecuted for doing what the defendant allegedly did is not, in itself, sufficient to establish selective prosecution.

*Mooney v. State*, 266 Ga. App. 587, 588 (1) (597 SE2d 589) (2004) (citations and punctuation omitted). Randolph has neither alleged nor shown that he was singled out on the basis of any arbitrary classification. Thus, the trial court did not err by denying his motion.

3. Randolph asserts that the state failed to prove venue in Camden County because there was no testimony to establish the location of the store where he introduced Foley to the other gang members. This claim of error lacks merit, as Dial testified that the store was in Camden County.

4. Randolph maintains that there was insufficient evidence to support his conviction for violating the Georgia Street Gang Terrorism and Prevention Act, OCGA § 16-15-1 et seq. Because the state failed to present evidence that Randolph's marijuana distribution crimes were intended to further the interests of the gang, we agree.

The Georgia Street Gang Terrorism and Prevention Act prohibits a person associated with a criminal street gang from participating in criminal street gang activity through the commission of a number of listed offenses. OCGA § 16-15-4 (a).

"Criminal street gang" is defined as "any . . . group of three or more persons associated in fact, whether formal or informal, which engages in criminal gang activity[.]" OCGA § 16-15-3 (2). "Criminal gang activity," in turn, is defined as "the commission, attempted commission, conspiracy to commit, or solicitation, coercion, or intimidation of another person to commit" any of a number of offenses, including "racketeering activity." OCGA § 16-15-3 (1) (A). "Racketeering activity" includes violations of the Georgia Controlled Substances Act. OCGA § 16-14-3 (5) (A) (xxxiv). It is not enough, however, for the state simply to show that the defendant and other gang members committed a criminal act; rather, "there must be some nexus between the act and an intent to further street gang activity." *Rodriguez v. State*, 284 Ga. 803, 807 (1) (671 SE2d 497) (2009); see also *Jones v. State*, 292 Ga. 656, 659 (1) (b) (740 SE2d 590) (2913) (state must prove that "the commission of the predicate act was intended to further the interests of the [gang]").

Thus far, we have uniformly rebuffed challenges that there was insufficient evidence of the requisite nexus between the crime and an intent to further gang interests. Our case law has supplied no test, guidelines, or list of factors relevant to determining whether the commission of a predicate crime was meant to "further the interests of the gang," *Jones*, 292 Ga. at 659; rather, we have simply analyzed the

13

evidence in each particular case and found it to be sufficient. And in each case, the state has shown something more than the mere commission of a crime by gang members.

In *Zamudio v. State*, 332 Ga. App. 37 (771 SE2d 733) (2015), for example, we rejected the gang-member defendant's argument that the state failed to prove that the fight that formed the basis of the criminal charges against him was undertaken to further the gang's interest. We noted that the victim was a former member of a rival gang who had recently rejected the defendant's overture to "hang out" and that immediately before the fight broke out, the defendant "started arguing about gang-related stuff." Id. at 42 (2) (b). We held that this evidence authorized the jury to find

> a nexus between the defendant['s] actions in seeking out and beating up
> the victim and [his] intent to further gang activity by ensuring that the
> gang responded strongly to the victim's disrepect of a gang member's
> offer of association.

Id. at 43 (2) (b).

Similarly, in *Alston v. State*, 329 Ga. App. 44, 46-47 (1) (763 SE2d 504) (2014), we held that evidence that the defendant and two fellow gang members wore gang colors to "represent" and talked about their gang affiliation moments before committing an armed robbery was sufficient to demonstrate a nexus between the

14

crime and an intent to further gang activity. In addition, the state presented evidence that after the crime, one defendant wrote a letter acknowledging that he had violated gang rules by implicating his fellow gang members in the crime, and there was expert testimony that "the gang's reputation is furthered by committing highly visible crimes in a manner which allows the witnesses and the victims to discern that a particular gang committed the crime." See also *Morey v. State*, 312 Ga. App. 678, 686 (2) (b) (719 SE2d 504) (2011) (affirming conviction under OCGA § 16-15-4 where there was testimony that defendant was "repping his gang" while committing crimes); *In the Interest of D. M.*, 307 Ga. App. 751, 752 (1) (706 SE2d 683) (2011) (nexus between crime and gang activity was shown by evidence that defendant and other gang members shot two people while wearing black bandannas over their faces, which "proclaims to the world that they are a [gang] member and that this is a gang act") (punctuation omitted).

Here, the state's case against Randolph rested almost entirely on his sworn testimony in the first trial, which was read aloud to the jury. That former testimony showed that Randolph, who was a member of Folk Nation, had introduced Foley, who was not affiliated with a gang, to a variety of other people – some gang-affiliated and some not – and had helped Foley distribute small amounts of marijuana to those

people. Thus, while the state may have shown that Randolph intended, by distributing marijuana, to further the interests of individual gang members in obtaining small quantities of marijuana for personal use, the state did not show that Randolph meant to further the interests of Folk Nation as an entity. There was no evidence, for example, that Randolph wore gang colors or accessories, talked about his gang affiliation, or otherwise "represented" the gang while he was committing drug crimes. Nor was there any evidence that Randolph's distribution of personal-use amounts of marijuana to individual gang members benefitted the gang itself through monetary profit, enhanced reputation, or other means. Because the state failed to present evidence of the necessary nexus between Randolph's drug crimes and an intent to further gang interests, his conviction under the Georgia Street Gang Terrorism and Prevention Act must be reversed.

5. Randolph maintains that the trial court erred by failing to merge his sentence for the drug crimes with his sentence on the gang crime. In light of our ruling in Division 4, we need not reach this issue.

*Judgment affirmed in part and reversed in part. Andrews, P. J., and Miller, J., concur.*