S16A1261. LUPOE v. THE STATE.
S16A1262. WILLIAMS v. THE STATE.
S16A1263. CARTER v. THE STATE.
(794 SE2d 67)

NAHMIAS, Justice.

Larry Lupoe, Kyshawn Williams, and Jacobey Carter were found guilty at trial of the malice murder of Tavares Moses, the aggravated assault and armed robbery of Carlos Wilson, the aggravated assault of Deandre Miller and Jumario Booker, and related crimes. We affirm the three appellants' convictions, but we have identified merger errors in sentencing that require vacating their sentences in part and remanding for resentencing.[1]

---

[1] The crimes occurred on August 2, 2012. On April 24, 2013, a Clayton County grand jury indicted Lupoe, Williams, and Carter along with Quandala Kilgore, Sierra Gilliam, and Parris Stready for malice murder, five counts of felony murder, armed robbery, aggravated assault, burglary, and two violations of the Georgia Street Gang Terrorism and Prevention Act (based on armed robbery and aggravated assault), all with Tavares Moses as the victim; the armed robbery and aggravated assault of Carlos Wilson; the aggravated assault of Deandre Miller; the aggravated assault of Jumario Booker; and possession of a weapon during the commission of a crime. Lupoe and Williams also were indicted for possession of a firearm by a convicted felon and felony murder based on that crime, but these two charges were severed for trial and then nolle prossed after the trial on the other counts.

Lupoe, Williams, and Carter were tried together from November 11 to 19, 2013. The jury found the appellants guilty of all charges with the exception of Lupoe's acquittal on the count of possession of a weapon during the commission of a crime. The appellants were sentenced on January 10, 2014. The trial court sentenced Lupoe and Williams to life in prison without the possibility of parole for malice murder, life for the armed robbery of Wilson, and 20 years each for the aggravated assaults of Wilson, Miller, and Booker, all to be served concurrently. The

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. According to Wilson and Booker, in July 2012, Moses, Wilson, and Miller were staying at the Home Lodge in Clayton County while their landlord repaired their apartment, and they were selling drugs out of their room. Booker occasionally came to visit them, and he was there on the night of the crimes. On July 31, the men changed rooms, and they were checking into Room 105 when they encountered a group of three women, later identified as Quandala Kilgore, Sierra Gilliam, and Parris Stready, and a man, later identified as Lupoe, in the lobby. One of the women offered them sex for money and gave them her phone number. Later that day, the women came to their room, again seeking to negotiate a prostitution transaction. When a price could not be agreed on, the women became angry and left. In Room 105, the victims had a shoebox containing drugs, some counterfeit money, and iPhones. The women returned several times during that day and the next, including the next night around midnight. During that visit, Brenton Carson, who also testified, was visiting the victims, sitting at a table in the room with his gun in plain view. The women left, and Carson then left.

Some time later, the women returned to Room 105. One of them knocked on the door, and when Miller opened it, three men rushed into the room. The intruders' faces were covered, at least two by hockey masks, and at least two of them had guns. The first man who came through the door began shooting toward Moses, who was sitting at the table with Booker. Another intruder approached Wilson, who was lying on the bed, pointed a gun at him, demanded money, and took his money and car keys. The intruders also took the shoebox. The men and women then fled. The victims were unable to identify any of

---

court also sentenced Williams to a consecutive five-year term for possession of a weapon during the commission of a crime. The court sentenced Carter to life in prison for malice murder and 20 years each for the armed robbery of Wilson and the aggravated assaults of Miller, Wilson, and Booker, all to be served concurrently, along with a consecutive five-year term for possession of a weapon during the commission of a crime. For each of the appellants, the court merged the remaining counts (all of which were committed against Moses) into the malice murder conviction. While it was proper to vacate the felony murder verdicts, the trial court erred, as we explain in Division 1 (b) below, in merging the verdicts for armed robbery, burglary, and the two counts of gang activity into the malice murder conviction.

All three appellants filed timely motions for new trial, which they then amended with new counsel. After several continuances, a hearing on Lupoe's motion was held on May 5, 2015, and a hearing on Williams's and Carter's motions was held on June 2, 2015. On August 8, 2015, the trial court denied the motions in three identical orders. Williams and Carter filed timely notices of appeal, and the trial court granted Lupoe's motion for an out-of-time appeal, which he then filed. The appeals were docketed in this Court for the April 2016 term and submitted for decision on the briefs. They have been consolidated for opinion.

the intruders, but Wilson identified Gilliam, and Booker identified all three women in photographic lineups.

Kilgore, Gilliam, and Stready testified pursuant to plea agreements with the State.[2] They corroborated Booker's and Wilson's testimony that they were working as prostitutes at the Home Lodge and that they tried to negotiate their services with the victims. Lupoe was staying with the women and serving as their pimp. According to the women, the victims refused to pay their price, so Kilgore, who was leading the negotiations, became angry. When the women returned to their room, Kilgore told Lupoe that they should rob the victims because the victims were being rude and disrespectful. She also told Lupoe that the victims had drugs, money, and iPhones. Lupoe and Kilgore formulated a plan for the women to go to the victims' room to "get them comfortable" before the robbery. Lupoe then called Williams and Carter, telling them that he had a robbery he needed help with. Williams and Carter arrived at the motel about 30 minutes later.

The women did not know the two men, but Gilliam heard one of them called Carter, and Lupoe introduced them to Kilgore as Carter and "K." Stready later identified Williams in a photographic lineup, and Kilgore and Gilliam identified all three appellants in court. When Williams and Carter arrived at the Home Lodge, Lupoe greeted them with a special handshake that Kilgore, who had known Lupoe for about a year, had seen him use with other people from the Pittsburgh neighborhood of Atlanta that he had identified as Jack City gang members. Lupoe had told Kilgore that he was a member of the gang; he had a jacket with a Jack City logo on it; and Kilgore heard Williams and Carter identify themselves as Jack City members. Lupoe told Williams and Carter about the plan to rob the victims, but the robbery did not occur that night, because the victims were not answering the phone.

The next night, August 1, Williams and Carter returned to the Home Lodge. Kilgore, Gilliam, and Stready went back to Room 105 to "scope out the scene," including the location of everyone in the room and if anyone had weapons. The women saw a man at the table with a gun, and Kilgore told him to put it away because Gilliam and Stready were scared of it. After ostensibly agreeing on a price for their

---

[2] Before the appellants' trial, Kilgore pled guilty to one count of aggravated assault and one count of armed robbery, with the State agreeing to recommend a sentence of 20 years to serve 15. Gilliam and Stready pled guilty to one count of aggravated assault, with the State agreeing to recommend a sentence of ten years to serve three for Gilliam; Stready was not questioned about the State's sentencing recommendation. Sentencing for all three women was deferred until after the trial.

services, the women returned to their room, informing the appellants that one of the men in the room had a gun. Williams said that would not be a problem because they had their own guns; he then left the room and returned with two hockey masks and two guns, which Williams and Carter kept. Shortly before 3:00 a.m. on August 2, the three women returned to Room 105. Stready called the appellants, who were following closely behind, so they could hear what happened when the women arrived at the room. One of the women knocked on the door; after it was opened, the appellants rushed in. Williams and Carter wore the hockey masks, and Lupoe covered his face with a red bandanna. Williams, who was first through the door, began shooting as he entered the room. Carter got money from Wilson, and Lupoe went through the pockets of another victim and took the shoebox with drugs in it. After the shooting started, the women ran away. Kilgore dropped her cell phone, and one of the black sandals she was wearing broke and fell off.

The women and the appellants all ran to the car that Carter and Williams had driven to the motel. Everyone got in, and they drove away. In the car, the three men discussed their plan for Carter to sell the drugs in the Pittsburgh area and then split the proceeds between them. They first stopped at a wooded area on Conley Road where Carter threw away some things, including a wallet and a mask. They then went to Carter's house in the Pittsburgh neighborhood. The three appellants went into the house with their guns and the box of drugs and other things taken from the victims' room. Only Williams and Lupoe returned, their hands empty. Stready said that she wanted to leave, and Lupoe told her that if the story of that night ever got out, "it would be nothing to get them [Williams and Carter] to do it again." He also told her to get rid of her cell phone. Shortly after that, Stready left in a taxi, Kilgore was dropped off at her aunt's house, and Gilliam was dropped off at a MARTA station.

Bryce Swiley, in whose room Lupoe and the women were staying at the Home Lodge, also testified, corroborating the women's story about the planning of the robbery, including that Williams and Carter had guns and masks and that Lupoe had a red bandanna. Swiley also identified all three appellants in photographic lineups.

After the crimes, Wilson called 911. When the police arrived at the Home Lodge, they found Moses, who had been shot five times, barely alive; he died of his wounds at the hospital. Inside Room 105, the police found four shell casings, all from the same .40-caliber Glock pistol. Outside the room, the police found Kilgore's cell phone and broken sandal. And in the parking lot, the police found a hockey mask, which DNA testing later showed had Williams's saliva on it. Kilgore, Gilliam, and Stready were later located and interviewed,

and Stready took police officers to the wooded area on Conley Road, where they found another hockey mask and a wallet containing Wilson's identification card. Lupoe's nickname was "El," and cell phone records showed that a phone registered to "God El" called Carter's and Williams's phones multiple times in the hours before the crimes, including calls to Carter's phone at 11:54 p.m. and Williams's phone at 12:15 a.m. Carter also received a call from Stready's cell phone at 2:27 a.m., just before the crimes.

At trial, William Murdock, an Atlanta Police Department detective who worked with the FBI's gang task force, was qualified without objection as an expert in criminal street gangs and criminal gang activity.[3] Detective Murdock testified about the evolution of the Jack City gang — the Jack City Boys — in the Pittsburgh neighborhood, various crimes involving the gang, and some of the gang's signs and symbols. He explained that although the gang does not have a specific color, most members are tied to the Bloods, whose color is red. He also testified that selling stolen drugs in the Pittsburgh area and splitting the proceeds from the robbery would be in furtherance of the gang's activity. He based his opinions as to the appellants' affiliations with the Jack City gang in part on their "gang profiles," which were maintained by the Atlanta Police Department and could be supplemented by various Atlanta police officers.

Detective Murdock testified that, in his expert opinion, Lupoe was an associate of the Jack City gang. Lupoe had frequent contact with gang members in the Pittsburgh neighborhood and had admitted that he stayed at least one night at a house where multiple items of Jack City paraphernalia were found. Detective Murdock added that he was personally familiar with Lupoe, because he was there when Lupoe was arrested in 2011 in the company of Jack City gang members. The State also introduced a picture that Detective Murdock explained showed Lupoe with Jack City members who were wearing gang shirts and making gang signs.

Detective Murdock also testified that, in his expert opinion, Williams was a member of the Jack City gang. In 2007, Williams was arrested for robbery with known Jack City gang members; later in 2007, he was threatened by members of a rival gang; in 2010, he was stopped with a known Jack City gang member with stolen items in the car; and in 2012, he was involved in a dispute with a weapon in which another Jack City gang member was involved. The lead

---

[3] We have held that "[e]xpert testimony by a qualified law enforcement officer regarding gang activity and culture is admissible and relevant to establish that a certain named organization is in fact a 'criminal street gang.' " *Hayes v. State*, 298 Ga. 339, 342 n.4 (781 SE2d 777) (2016).

detective in this case also testified that she printed several photographs found on Williams's Facebook page that included references to the Jack City gang and another photograph that showed Lupoe. Finally, Detective Murdock testified that, in his expert opinion, Carter was also a member of the Jack City gang. Carter had been previously stopped in the Pittsburgh area with his girlfriend Adrianna Jumper, driving a car that had a bullet hole away from an area where shots had been recently fired. When Jumper was interviewed, she told the police that Carter was a member of the Jack City gang. The appellants did not testify at trial.

(a) All three appellants contend that the evidence was insufficient to support their convictions, particularly their convictions for gang activity. Appellants were indicted on two counts of violating the Street Gang Terrorism and Prevention Act, OCGA § 16-15-1 et seq. These counts alleged that the appellants violated the Act by participating in criminal street gang activity through the commission of an armed robbery and aggravated assault of Moses while "associated with [the] Jack City Boys, a criminal gang." See OCGA §§ 16-15-4 (a) ("It shall be unlawful for any person employed by or associated with a criminal street gang to conduct or participate in criminal gang activity through the commission of any offense enumerated in [OCGA § 16-15-3 (1)]"); 16-15-3 (1) (A), (J) (both defining such offenses so as to include armed robbery and aggravated assault); 16-15-3 (2) (defining "criminal street gang" to mean "any organization, association, or group of three or more persons associated in fact, whether formal or informal, which engages in criminal gang activity as defined in [OCGA § 16-15-3 (1)]").

With regard to the guilty verdicts on these two counts, we conclude that when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to show that the Jack City Boys was a criminal street gang, that the appellants were associated with that gang, and that the armed robbery and aggravated assault of Moses constituted criminal street gang activity and were intended to further the interests of the gang. See *Rodriguez v. State*, 284 Ga. 803, 807 (671 SE2d 497) (2009). Thus, the evidence was legally sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that the appellants were guilty of the charged violations of OCGA § 16-15-4. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). Similarly, the evidence presented at trial was sufficient to authorize a rational jury to find the appellants guilty beyond a reasonable doubt of the other crimes for which they were found guilty. See id. See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) (" 'It was for the jury to

determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

(b) A sentencing error involving the merger of counts may be corrected on appeal even if the issue was not raised by the parties. See *Hulett v. State*, 296 Ga. 49, 54 (766 SE2d 1) (2014). As explained in footnote 1 above, the trial court merged the guilty verdicts for armed robbery, burglary, and the two counts of gang activity, all of which were committed against Moses, into the conviction for malice murder of Moses. This was error. The felony murder counts based on those offenses were vacated as a matter of law, and we have held that armed robbery and burglary do not merge into malice murder. See id. at 55-56 (armed robbery); *Favors v. State*, 296 Ga. 842, 848 (770 SE2d 855) (2015) (burglary). Likewise, the gang activity counts did not merge as that crime and malice murder each require proof of an element that the other does not. See *Drinkard v. Walker*, 281 Ga. 211, 215 (636 SE2d 530) (2006) (explaining that two crimes do not merge if each crime "requires proof of a fact which the other does not" (punctuation and footnote omitted)); OCGA § 16-5-1 (a) (defining malice murder to require the death of the victim); OCGA § 16-15-4 (a) (defining criminal gang activity to require association with a criminal street gang).[4] Accordingly, we vacate the appellants' sentences to the extent that each appellant was not sentenced on these four counts, and we remand the case for the appellants to be properly sentenced on those counts. See *Hulett*, 296 Ga. at 56.

### S16A1261. Lupoe v. State

2. Lupoe contends that his trial counsel provided constitutionally ineffective assistance in three respects. We disagree.

> To prevail on his claim of ineffective assistance, [Lupoe] must prove both that the performance of his lawyer was deficient and that he was prejudiced by this deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove that the performance of his lawyer was deficient, [Lupoe] must show

---

[4] We note that the armed robbery of Moses was both a freestanding count and the predicate offense for one of the criminal gang activity counts. Those counts do not merge, however, because OCGA § 16-15-4 (m) says that "[a]ny crime committed in violation of this Code section shall be considered a separate offense," thus indicating the General Assembly's intent to impose separate punishment for conduct that violates both OCGA § 16-15-4 and another felony statute. See *Zamudio v. State*, 337 Ga. App. 531, 532 (786 SE2d 569) (2016) (holding based on OCGA § 16-15-4 (m) that "predicate acts for any offenses listed in the Street Gang Act do not merge with the separately charged violation of the Street Gang Act").

that the lawyer performed his duties at trial in an objectively unreasonable way, considering all the circumstances, and in the light of prevailing professional norms. Id. at 687-688 (III) (A). See also *Kimmelman v. Morrison*, 477 U. S. 365, 381 (II) (C) (106 SCt 2574, 91 LE2d 305) (1986). And to prove that he was prejudiced by the performance of his lawyer, [Lupoe] must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U. S. at 694 (III) (B). See also *Williams v. Taylor*, 529 U. S. 362, 391 (III) (120 SCt 1495, 146 LE2d 389) (2000). This burden, although not impossible to carry, is a heavy one. See *Kimmelman*, 477 U. S. at 382 (II) (C).

*Aikens v. State*, 297 Ga. 229, 231 (773 SE2d 229) (2015). Moreover, in examining an ineffectiveness claim, a court need not

address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

*Strickland*, 466 U. S. at 697.

(a) Lupoe first contends that his trial counsel was ineffective in failing to file a timely special demurrer to the two counts of gang activity. However, even assuming, without deciding, that a timely special demurrer would have had merit and that trial counsel performed deficiently rather than strategically in failing to file one, Lupoe has not shown prejudice, because he failed to show that the State could not have simply re-indicted him after the grant of the special demurrer. See *Bighams v. State*, 296 Ga. 267, 270-271 (765 SE2d 917) (2014) (holding that the appellants failed to show prejudice on their claims that their trial counsel provided ineffective assistance by failing to file timely motions to quash the indictment, because the State had evidence to support a re-indictment and there was no imminent statute of limitation deadline); *Chapman v. State*, 318 Ga. App. 514, 518 (733 SE2d 848) (2012) (finding no prejudice on an

ineffective assistance claim based on trial counsel's failure to file a special demurrer, where the appellant did "not demonstrate a statute of limitation defense or other manner in which requiring the State to re-indict him was reasonably likely to result in a different outcome"); *Washington v. State*, 298 Ga. App. 105, 106 (679 SE2d 111) (2009) ("[B]ecause a defendant can be re-indicted after the grant of a special demurrer, a failure to file such a demurrer generally will not support a finding of ineffective assistance of counsel.").

(b) Lupoe next contends that his trial counsel was ineffective in failing to conduct a reasonable investigation of the case. Again, however, Lupoe has failed to show prejudice from this asserted deficiency in performance. At the motion for new trial hearing, Lupoe "failed to present any evidence as to what further research would have revealed or how any additional information would have improved his position." *Davis v. State*, 299 Ga. 180, 191 (787 SE2d 221) (2016). To show prejudice on a claim that trial counsel failed to adequately investigate the case, Lupoe had to at least make "a proffer as to what additional investigation would have uncovered," and not merely "speculate that such information exists and would have made a difference." Id.

(c) Finally, Lupoe contends that his trial counsel was ineffective in failing to file a motion to sever his trial from those of his co-defendants Williams and Carter. We conclude that Lupoe has failed to prove either component of this ineffectiveness claim.

At the motion for new trial hearing, although Lupoe's trial counsel said in hindsight that a motion to sever might have been appropriate, he was not questioned about *why* he did not file such a motion. Whether to seek severance is a matter of trial strategy, see *Powell v. State*, 297 Ga. 352, 356 (773 SE2d 762) (2015), and in the " 'absence of evidence to the contrary, counsel's decisions are presumed to be strategic and thus insufficient to support an ineffective assistance of counsel claim.' " *Mitchell v. State*, 290 Ga. 490, 492 (722 SE2d 705) (2012) (citation omitted).

Moreover, Lupoe failed to show that if his trial counsel had filed a motion to sever, the trial court would have granted it.

> When several defendants are indicted together for a capital crime, but the State does not seek the death penalty, whether the defendants are to be tried together or separately is a matter committed to the sound discretion of the trial court. In ruling on a severance motion, the court should consider: (1) the likelihood of confusion of the evidence and law; (2) the possibility that evidence against one defendant may be considered against the other defendant; and (3) the presence

or absence of antagonistic defenses. And to require a severance, the burden is on the defendant requesting the severance to do more than raise the possibility that a separate trial would give him a better chance of acquittal. He must make a clear showing that a joint trial would lead to prejudice and a consequent denial of due process.

*Blackledge v. State*, 299 Ga. 385, 387-388 (788 SE2d 353) (2016) (citations and punctuation omitted).

Here, if trial counsel had filed a motion to sever, the trial court would not have abused its discretion in denying it. Lupoe asserts that the jury might have been confused by the number of co-defendants, but there were only three co-defendants, they were tried for almost the same offenses, the law and evidence was substantially the same for all of them, and the State's evidence was that the co-defendants acted together in committing the crimes. See *Blackledge*, 299 Ga. at 388. In addition, the trial court "provided separate verdict forms for each defendant in order to avoid the potential for confusion." *Nwakanma v. State*, 296 Ga. 493, 498 (768 SE2d 503) (2015). And contrary to Lupoe's contention, there was no evidence that was admissible against Williams and Carter that was inadmissible against him. To the extent that Lupoe argues that in a separate trial, the evidence of the gang activities of his two co-defendants would not be admissible against him, that is incorrect. See *Zamudio v. State*, 332 Ga. App. 37, 44 (771 SE2d 733) (2015) (rejecting a similar contention on the ground that OCGA § 16-15-9 provides that "(t)he commission of any offense enumerated in [OCGA § 16-15-3 (1)] by any member or associate of a criminal street gang shall be admissible in any trial or proceeding for the purpose of proving the existence of the criminal street gang and criminal gang activity").

Furthermore, even assuming, as Lupoe argues, that his co-defendants raised antagonistic defenses, "[t]hat alone . . . is insufficient to require severance, because 'unless there is a showing of resulting prejudice, antagonistic defenses do not automatically require a severance.'" *Krause v. State*, 286 Ga. 745, 750 (691 SE2d 211) (2010) (citation omitted). Lupoe has shown no specific prejudice from antagonistic defenses that would have required the trial court to grant a motion to sever. Finally, Lupoe's assertion that he would have had the the benefit of the testimony of Williams and Carter in a separate trial is mere speculation, as he has not shown that his co-defendants would not have invoked their right against self-incrimination. See *Long v. State*, 287 Ga. 886, 890 (700 SE2d 399) (2010). Lupoe also has failed to show that Williams's and Carter's testimony would have been

favorable to him. See id. For these reasons, we conclude that Lupoe has failed to show deficient performance or prejudice on this ineffectiveness claim.

3. Lupoe contends that the limiting instruction that the trial court gave to the jury before Detective Murdock, the State's expert on criminal street gangs and criminal gang activity, testified was insufficient with regard to gang activities that did not involve the three co-defendants. However, considering that initial charge in the context of the jury charge as a whole, there was no reversible error. See *Drayton v. State*, 297 Ga. 743, 748-749 (778 SE2d 179) (2015) (explaining that before a jury charge will be considered reversible error, it must be considered in the context of the jury instructions as a whole). Here, the trial court gave a more complete limiting instruction on this matter in its final charge to the jury, and considered as a whole, we conclude that the court appropriately limited the jury's consideration of the evidence in question.

4. We next consider Lupoe's contention that the trial court erred by permitting Detective Murdock to give hearsay testimony about Lupoe's gang connections. Lupoe did not make this objection at trial, so we review this claim only for plain error. See OCGA § 24-1-103 (d).

> To show plain error, [Lupoe] must point to an error that was not affirmatively waived, the error must have been clear and not open to reasonable dispute, the error must have affected his substantial rights, and the error must have "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings."

*Mosley v. State*, 298 Ga. 849, 851 (785 SE2d 297) (2016) (citation omitted). The third component of this test " 'requires the appellant to make an affirmative showing that the error probably did affect the outcome below.' " *Shaw v. State*, 292 Ga. 871, 873 (742 SE2d 707) (2013) (citation omitted). "Satisfying all four prongs of this standard is difficult, as it should be." *State v. Kelly*, 290 Ga. 29, 33 (718 SE2d 232) (2011) (citation and punctuation omitted). We find no plain error here.

Even assuming that Detective Murdock's expert testimony included some impermissible hearsay — although experts may sometimes rely on and testify about otherwise inadmissible hearsay regarding their opinions, see OCGA § 24-7-703 — much of his testimony was based on his personal knowledge. This included the detective's testimony that he was personally familiar with Lupoe; his identification of Lupoe in a photograph taken in the Pittsburgh neighborhood with other Jack City gang members who were wearing gang shirts and

making gang signs; his presence when Lupoe was arrested in 2011 in the company of Jack City gang members, including its leader; and that Lupoe admitted that he stayed at least one night at the house where the arrest was made and where multiple items of Jack City paraphernalia were found. In addition, Kilgore testified that when Williams and Carter arrived at the Home Lodge, Lupoe greeted them with a special gang handshake and that Lupoe had told her that he was a member of the gang and had a jacket with a Jack City logo on it. Given this ample non-hearsay evidence, we conclude that, even assuming that the detective's testimony included some improper hearsay, Lupoe has failed to show that any such error probably affected the outcome of his trial. See *Shaw*, 292 Ga. at 873.

5. Finally, Lupoe contends that his trial counsel was ineffective in failing to object to Detective Murdock's alleged hearsay testimony. For the same reasons that Lupoe cannot meet his burden to show plain error with regard to this testimony, we conclude that he has failed to show that, even assuming that trial counsel performed deficiently in failing to object, there is no reasonable probability that the outcome of his trial would have been different. See *Strickland*, 466 U. S. at 687.

### S16A1262. Williams v. State

6. Williams contends that his trial counsel provided ineffective assistance by not filing a motion in limine to preclude the prosecutor from referring to certain photographs of Williams posted on his Facebook page in her opening statement and to exclude the photos from evidence. The record shows, however, that Williams's trial counsel objected to the Facebook photos before they were introduced into evidence at trial, contending that the officer who obtained them did so fraudulently and that the photos should be excluded because anyone can "tag" a photograph and insert it on someone else's Facebook page. Those objections were overruled, and the trial court admitted the evidence. Williams does not contend on appeal that the trial court erred in denying those objections or that the objections that trial counsel raised were insufficient, nor does he specify what other objection his counsel should have made. Thus, to the extent that Williams maintains that his trial counsel provided ineffective assistance, he has not shown that counsel performed deficiently. And to the extent that he maintains that his trial counsel provided ineffective assistance by not raising objections before opening statements, Williams has failed to show prejudice, because he has not identified what further objection counsel should have made that would have resulted in the photographs being excluded.

7. Williams also argues that his trial counsel was ineffective in failing to move for a continuance so that he could file a motion to compel the State to provide the defense with copies of the video recorded statements of various witnesses, including his co-defendants. However, at the motion for new trial hearing, Williams did not present any evidence as to what additional information a motion to compel the videos would have revealed or how that information would have improved his position. See *Davis*, 299 Ga. at 191. Thus, Williams has failed to show prejudice on this ineffective assistance claim. See id.

8. Williams contends next that the trial court erred in admitting evidence of his prior gang activity, asserting that it was inadmissible character evidence under OCGA § 24-4-404 (b). Acknowledging that his trial counsel failed to raise this specific objection at trial — where counsel objected only on the ground that some of the activity occurred when Williams was a juvenile — Williams also argues that the trial court erred in ruling that trial counsel was not ineffective in this regard.

Due to the lack of objection at trial, we review Williams's current assertion that the trial court erred in admitting this evidence only for plain error. See *Mosley*, 298 Ga. at 851. But there was no error, much less plain error. To prove the gang activity counts, the State had to prove that Williams was associated with a "criminal street gang," which is defined in OCGA § 16-15-3 (2) as "any organization, association, or group of three or more persons associated in fact" that engages in "criminal gang activity," which means the commission of any of the offenses enumerated in OCGA § 16-15-3 (1). See OCGA § 16-15-4 (a). Moreover, OCGA § 16-15-9 says that "[f]or the purpose of proving the existence of a criminal street gang and criminal gang activity, the commission, adjudication, or conviction of any offense enumerated in [OCGA § 16-15-3 (1)] by any member or associate of a criminal street gang shall be admissible in any trial or proceeding. . . ."

Thus, the evidence of Williams's prior participation in gang activities was directly relevant to an element of the State's case and did not constitute improper character evidence when admitted for that limited purpose (and an adequate limiting instruction was given at trial, see Division 3 above). See *United States v. Pope*, 132 F3d 684, 689 (11th Cir. 1998) ("The evidence that [defendant] contends was admitted in error was direct evidence of [his] guilt with respect to the crimes charged in the indictment and therefore it did not fall within Rule 404 (b)."); *United States v. Lane*, 323 F3d 568, 579 (7th Cir. 2003) (noting that Federal Rule of Evidence 404 (b) "is inapplicable where the 'bad acts' alleged are really direct evidence of an essential part of the crime charged."). Moreover, Williams's trial counsel was not ineffective in failing to assert a meritless objection under OCGA § 24-4-404 (b). See *Moss v. State*, 298 Ga. 613, 617 (783 SE2d 652)

(2016) (" '(T)he failure to make a meritless motion or objection does not provide a basis upon which to find ineffective assistance of counsel.' " (citation omitted)).

9. Williams contends that his trial counsel provided ineffective assistance by failing to hire a DNA expert to challenge the DNA evidence admitted against him at trial. However, at the motion for new trial hearing, Williams did not present any evidence as to what additional information a DNA expert would have offered or how that evidence would have improved his position. See *Davis*, 299 Ga. at 191. Williams therefore failed to show prejudice on this claim of ineffective assistance. See id.

10. In his next enumeration of error, Williams contends that his trial counsel was ineffective in failing to renew his objection to gang-related testimony, thereby waiving his right to contend on appeal that the testimony was improper character evidence. In Division 8 above, we explained why there was no ineffective assistance in regard to not making a character-evidence objection.

In this enumeration, Williams also argues that his trial counsel was ineffective in failing to object to the State's improper bolstering of certain witnesses. Williams does not specify the alleged bolstering testimony or attempt to explain how it was improper bolstering. It appears, however, that he may be referring to one or more witnesses who testified that statements they made to the police before trial were consistent with their trial testimony. But these witnesses did not recount their prior statements, and the statements were not admitted into evidence. Under these circumstances, we conclude that even assuming trial counsel performed deficiently in failing to object to such testimony, there is not a reasonable probability that objections would have resulted in a different outcome at trial, particularly in light of the overwhelming evidence of Williams's guilt, including the DNA evidence showing that his saliva was on the hockey mask found in the Home Lodge parking lot. See *Strickland*, 466 U. S. at 687.

11. At trial, Williams asked Brenton Carson — the man who visited the victims' room earlier on the night of the crimes — if he was a member of "the Blood Street gang." The State objected on the grounds of relevancy and improper character evidence, and the trial court sustained the objection. Williams now contends that this ruling was erroneous, asserting for the first time on appeal that the answer to the question would have shown that the witness was a member of a rival gang and therefore had a bias against him.[5]

---

[5] The evidence rule on which Williams now relies, OCGA § 24-6-607, which says that "[t]he credibility of a witness may be attacked by any party," does not pertain to this issue. However,

Because it was not apparent from the discussion at trial that Williams was seeking to introduce evidence of bias, this issue is not subject to ordinary review on appeal but is reviewable only for plain error. With regard to ordinary review, OCGA § 24-1-103 (a) (2) says, "Error shall not be predicated upon a ruling which . . . excludes evidence unless a substantial right of the party is affected and . . . the substance of the evidence was made known to the court by an offer of proof or was apparent from the context within which questions were asked." This provision does not require "a formal offer of proof in every instance, as it expressly states that error also may be preserved if the substance of the evidence is apparent from the record." *Williams v. State*, 332 Ga. App. 546, 547 (774 SE2d 126) (2015).

However, the substance of the evidence that Williams sought to elicit from Carson was not sufficiently apparent from the discussion at trial to preserve the issue for ordinary review. When the State raised relevance and character objections to Williams's question, he did not even allude to Carson's possible bias as the reason for the question. Instead, Williams appeared to argue that the evidence was relevant, saying that "this trial is about gangs [and] I'm allowed to ask him about any type of gang affiliation"; that his question would not elicit improper character evidence; and that he was entitled to a thorough and sifting cross-examination, see OCGA § 24-6-611 (b). Based on this colloquy, the substance of the evidence that Williams now says that he wanted to elicit — that Carson was biased against him due to membership in a rival gang — would not have been apparent to the trial court. Accordingly, this claim may be reviewed only for plain error. See OCGA § 24-1-103 (d).

Under that standard, even if we assume that the trial court committed an "obvious" error in not allowing Williams to question

---

OCGA § 24-6-622 says, "The state of a witness's feelings towards the parties and the witness's relationship to the parties may always be proved for the consideration of the jury." Under the substantially identical provision of Georgia's old Evidence Code, see former OCGA § 24-9-68, we held that a trial court did not abuse its discretion in admitting evidence that the defendant and his alibi witnesses were members of the same gang and that the gang name "meant 'I will die for you, you will die for me' as this evidence was relevant to show the state of the witnesses's feelings toward appellant and his relationship to them." *Hayes v. State*, 265 Ga. 1, 3 (453 SE2d 11) (1995), overruled on other grounds as noted in *Clark v. State*, 271 Ga. 6, 10 (515 SE2d 155) (1999). See also *United States v. Abel*, 469 U. S. 45, 48-49 (105 SCt 465, 83 LE2d 450) (1984) (holding under Federal Rule of Evidence 608 that evidence that a defense witness and the defendant were members of the same prison gang and that the tenets of the gang required members to "lie, cheat, steal, (and) kill" to protect each other "was sufficiently probative of [the witness's] possible bias towards [the defendant] to warrant its admission into evidence" on cross-examination); OCGA § 24-6-608; *United States v. Tsosie*, 288 Fed. Appx. 496, 499 (10th Cir. 2008) (explaining that "[e]vidence of gang affiliation is admissible for proving a witness's bias if a proper foundation is laid [demonstrating that the gang affiliation shows bias] and the evidence is not more prejudicial than probative").

Carson about his gang membership (notwithstanding Williams's failure to alert the court to the potentially legitimate reason for the question), he has failed to show that the error affected his substantial rights. See *Mosley*, 298 Ga. at 851. Any rational juror would have already surmised that Carson was biased against Williams due to the fact that three of the victims were Carson's friends (Moses, Booker, and Miller) and the fourth was his cousin (Wilson). Moreover, Carson did not identify Williams as being at the Home Lodge or otherwise directly inculpate him. Given these considerations and the overwhelming evidence of Williams's guilt, we conclude that he has not demonstrated that any error in his not being allowed to get an answer to this single question probably affected the outcome of his trial, and he therefore has not established plain error. See *Mosley*, 298 Ga. at 851-852.

12. Williams asserts that his trial counsel was ineffective in failing to object to testimony by Detective Murdock that described crimes committed by the Jack City Boys that did not involve him or his co-defendants. Trial counsel, however, testified at the motion for new trial hearing that he chose not to object to this testimony because it was not tied to Williams, and he decided to focus on challenging evidence that allegedly tied Williams to the gang. " 'Trial tactics and strategy, no matter how mistaken in hindsight, are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them.' " *McNair v. State*, 296 Ga. 181, 184 (766 SE2d 45) (2014) (citation omitted). Here, Williams has not shown that his counsel's decision not to object to this testimony was unreasonable, particularly given the general admissibility of this type of evidence, see OCGA § 16-15-9. This claim of ineffectiveness is therefore without merit.

13. Williams contends that his trial counsel was ineffective in failing to object to certain photographs that were admitted for demonstrative purposes. Because the photographs depicted, among other things, the type of signs, symbols, and clothing worn by the Jack City gang and were used by the State's gang expert to assist in establishing the existence of that gang, which the State had the burden to prove, the photographs were admissible. See OCGA § 16-15-3 (2) (providing that the existence of a street gang "may be established by evidence of a common name or common identifying signs, symbols, tattoos, graffiti, or attire or other distinguishing characteristics, including, but not limited to, common activities, customs, or behaviors"); *Hayes*, 298 Ga. at 342 n. 4 (explaining that "[e]xpert testimony by a qualified law enforcement officer regarding gang activity and culture is admissible and relevant to establish that a certain named

organization is in fact a 'criminal street gang' "). Trial counsel was not ineffective in failing to raise a meritless objection. See *Moss*, 298 Ga. at 617.

14. Finally, Williams contends that the trial court erred in precluding him from cross-examining two State witnesses, who were both prisoners and, according to Williams, were kept in a holding cell together during a trial recess, about whether they discussed their testimony with each other. Even assuming the trial court erred, however, any error was harmless in light of the overwhelming evidence of Williams's guilt.

## S16A1263. Carter v. State

15. Carter contends that the trial court erred in permitting Detective Murdock to testify inaccurately on direct examination that two guns and a large amount of cash were found in Carter's car when he was stopped in the Pittsburgh neighborhood with his girlfriend, driving a car that had a bullet hole in it away from an area where shots had recently been fired. Carter did not object to this testimony, and we therefore review it only for plain error. See OCGA § 24-1-103 (d). On cross-examination, Detective Murdock admitted that the items were not actually found in Carter's car, but in another car that was driving away from the scene of the shooting at the same time; the detective apologized for the mistake. There was no obvious legal error — the trial court could not divine that the initial testimony was inaccurate without an objection on that point — and because the witness admitted his mistake and made clear that the guns were not in Carter's car, Carter also cannot show that the testimony probably affected the outcome of the trial. He therefore has failed to show plain error. See *Mosley*, 298 Ga. at 851-852.

Carter claims that his trial counsel provided ineffective assistance by failing to seek a mistrial when Detective Murdock admitted his mistake. Putting aside whether counsel performed deficiently in not moving for a mistrial, Carter cannot satisfy the prejudice prong of the ineffectiveness test. See *Strickland*, 466 U. S. at 697. Because the witness corrected his testimony on cross-examination, the trial court would have been well within its discretion to determine that a mistrial was not essential to preserve Carter's right to a fair trial and to therefore deny such a motion. See *Brown v. State*, 297 Ga. 685, 690 (777 SE2d 466) (2015) (holding that trial counsel was not ineffective in failing to move for a mistrial because the trial court, under the circumstances, "would have been well within its discretion to deny a mistrial").

16. Carter next claims that the trial court erred in permitting Detective Murdock to testify that Carter's girlfriend told the police in an interview that he was a member of the Jack City gang. Carter now contends that the detective's testimony was inadmissible hearsay and violated his constitutional right of confrontation because his girlfriend's statement was given during a police interview and was testimonial in nature. Once again, no objection was made to this testimony, so we review it only for plain error, although Carter also claims that his trial counsel was ineffective in failing to object to the testimony.

We conclude that Carter has not shown the harm required for plain error, see *Mosley*, 298 Ga. at 852-853, or the prejudice required for ineffective assistance, see *Strickland*, 466 U. S. at 697. Beyond the girlfriend's statement, there was evidence that when Williams and Carter arrived at the Home Lodge, Kilgore heard Carter identify himself as a Jack City member and saw him greet Lupoe using a special gang handshake. There was also evidence that Carter lived in the Pittsburgh neighborhood; that the appellants went to his house there after the crimes were committed; and that the appellants shared the proceeds of the robbery, which was a standard Jack City gang practice. We therefore reject these claims.

17. Carter asserts that the evidence of Lupoe's and Williams's gang affiliations and activities unduly prejudiced the jury against him and denied him due process. To the extent that Carter is contending that the trial court made an evidentiary error in not excluding this evidence on the ground of prejudice, see OCGA § 24-4-403 (saying that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice"), he made no such objection at trial. The issue is therefore reviewable only for plain error. See OCGA § 24-1-103 (d). Because the evidence of Lupoe's and Williams's gang affiliations and activities was relevant to the gang-related counts of the indictment, see *Zamudio*, 332 Ga. App. at 44; OCGA §§ 16-15-3 (2); 16-15-9, and the trial court gave an appropriate limiting instruction regarding this evidence, see Division 3 above, the trial court did not abuse its discretion in admitting that evidence. There was therefore no error, plain or otherwise. To the extent that Carter contends that OCGA §§ 16-15-3 (2) or 16-15-9 violates due process as applied to him, he did not raise this constitutional claim at trial, and it is therefore not preserved for appeal. See *Catoosa County v. R.N. Talley Properties, LLC*, 282 Ga. 373, 374 (651 SE2d 7) (2007) ("The issue of whether a statute or an ordinance 'is unconstitutional as applied . . . may not be (raised) for the first time on appeal.' " (citation omitted)).

18. Carter contends that his trial counsel was ineffective in failing to file a motion to sever his trial from those of Lupoe and Williams, asserting that a severance motion was required due to the spillover effect on him of the gang evidence against his co-defendants. At the motion for new trial hearing, trial counsel testified that she did not file a motion to sever because she did not believe that the gang evidence was strong and she believed that there would not be a spillover effect. Because we cannot say that this strategic decision was so patently unreasonable that no competent attorney would have made it, see *McNair*, 296 Ga. at 184, we conclude that trial counsel did not perform deficiently in this respect. Moreover, as with Lupoe's contention that his trial counsel was ineffective in failing to file a motion to sever, if Carter's counsel had filed such a motion, the trial court would not have abused its discretion in denying the motion. In particular, to the extent that Carter argues that in a separate trial, the evidence of the gang activities of his two co-defendants would not be admissible against him, that is incorrect. See *Zamudio*, 332 Ga. App. at 44; OCGA § 16-15-9. See generally Division 2 (c) above.

19. Finally, Carter alleges that the trial court erred in sustaining the State's objection that his question to a State's witness on recross-examination was improper because it was outside the scope of the redirect examination. Our review of the record, however, shows that the trial court did not sustain the State's objection. On recross of a detective, Carter's counsel asked if, "[o]ut of all the evidence that you have collected that's here, did any evidence come back to Jacobey Carter?" When the State objected on the ground that the question was outside the scope of the redirect examination, Carter's counsel said that she was "just asking [the detective] based on . . . her investigation." The trial court responded that the State's objection was based on the question being "outside the scope of . . . her redirect." Carter's counsel then said, "No further questions." Because the record shows that the trial court was asking Carter's counsel to respond to the State's objection, not sustaining it, and counsel simply dropped the matter, this enumeration presents nothing for review.[6]

---

[6] We note that the Eleventh Circuit has said:

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const., amend. VI. Accordingly, "the defendant must be permitted sufficient cross-examination to allow a jury to adequately assess the witness' credibility. . . ." *United States v. Ross*, 33 F.3d 1507, 1517 (11th Cir. 1994). However, "a defendant has no constitutional right to recross-examination." Id. at 1518. "A defendant nonetheless does have a limited right to recross-examination where a new matter is brought out on redirect examination." Id. "When material new matters are brought out on redirect examination, the Confrontation Clause of the Sixth Amendment mandates that the opposing party be given the right

*Judgments affirmed in part and vacated in part, and cases remanded for resentencing. All the Justices concur.*

DECIDED NOVEMBER 21, 2016.

*Deborah L. Leslie*, for appellant (case no. S16A1261).
*Stanley W. Schoolcraft III*, for appellant (case no. S16A1262).
*Viveca R. Famber Powell*, for appellant (case no. S16A1263).
*Tracy Graham Lawson, District Attorney, Elizabeth A. Baker, Kathryn L. Powers, Assistant District Attorneys; Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General*, for appellee.

---

of recross-examination on those new matters." Id. (citation and quotation omitted).
*United States v. Adams*, 133 Fed. Appx. 642, 646 (11th Cir. 2005).