**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER and COLVIN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed. https://www.gaappeals.us/rules

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**July 19, 2021**

# In the Court of Appeals of Georgia

A21A1068. RENDON-VILLASANA v. THE STATE.

MERCIER, Judge.

A jury found Gabriel Rendon-Villasana guilty of the kidnapping, rape, and sexual battery of a one victim,[1] and the kidnapping and aggravated assault with intent to rape a second victim. Following the denial of his motion for new trial, Rendon-Villasana appeals, challenging the denial of his motion for directed verdict and asserting that his trial counsel was ineffective for failing to request funds for an expert witness. We affirm.

Viewing the evidence, as we must, in light most favorable to the jury verdicts, *Wilcox v. State*, 310 Ga. 428, 431 (1) (851 SE2d 587) (2020), the evidence showed the following. On June 20, 2015, the first victim, M. G., and several of her friends

---

[1] The sexual battery verdict merged into the rape verdict.

were out celebrating a birthday and planned to stay overnight at a hotel. They visited different bars in the Buckhead area of Atlanta and had several alcoholic shots and drinks. M. G. became "very intoxicated." As the bars started to close for the night, the group began "ordering Ubers to take [them] back to the hotel." When they "saw what [they] thought were all of the Ubers parked in a line right next to the road," they "all piled into . . . the cars." M. G., and one of her male friends, E. N., who was also "very intoxicated," got into the second vehicle, a gray or silver SUV, because the first vehicle was full. Before getting in the vehicle, E. N. asked the man driving if he "was [their] Uber driver," to which the man replied, "Yes."

Although E. N. gave the driver the address of the hotel where they were staying, the driver stopped "a block or two" from the hotel. When E. N. stepped out of the vehicle, the driver sped off with the door still open and M. G. still inside. E. N. chased the vehicle but there was no way "[he] could catch it." E. N. called police, some friends, and M. G.'s parents. He also called M. G. to tell her to get out of the vehicle, but she did not answer. E. N. recalled that M. G. was asleep when he stepped out of the vehicle.

M. G. did not remember getting into the vehicle and could not identify the driver of the vehicle. The next thing she remembered after drinking in the bar with

E. N. was "being woken up" on an apartment complex sidewalk by a woman who gave her a glass of water. Disoriented and confused, M. G. called a friend who picked her up and took her to the hotel where she spoke with investigators. M. G. realized that the tampon she had in place the night before was missing. Her parents arrived and took her to the hospital where she was examined for sexual assault. M. G.'s vaginal/cervical swab revealed the presence of male DNA, which a forensic expert concluded came from semen, and blood was found in the "vaginal vault," which a nurse testified could be a sign of trauma.

On October 3, 2015, the second victim, K. H., met with some friends from college for drinks in the Buckhead area of Atlanta. At some point during the night, K. H. became intoxicated. Around 2:00 a.m., K. H. and her male friend, M. C., , who was also "very drunk," decided to leave together, and M. C. called an Uber to take them to his home. M. C. recalled that when a vehicle arrived, he asked the driver if he was there to pick them up and gave the driver his address. K. H. and M. C. then got into the back of the vehicle. At some point during the ride, K. H. "passed out." The driver stopped across the street from M. C.'s house, and when M. C. stepped out of the vehicle to "help [K. H.] out the other side," the driver "took off" with K. H. M. C.'s cell phone was in the vehicle and he had no other phones in his home, so he

"went in and went to sleep" because what had just happened "didn't fully register," and he "figured [the driver] didn't trust leaving a passed-out girl with a drunk man." M. C. stated that he "didn't think there was anything [he] could do, and [he] didn't really understand the gravity of the situation."

A couple of hours later, around 4:00 a.m., , a police officer observed an SUV traveling without headlights. The officer activated his blue lights to conduct a traffic stop. K. H. remembered waking up in the back of a vehicle "and there was flashing lights behind us and [the driver] wasn't pulling over." She yelled at the driver to pull over. The driver did not stop immediately, but eventually pulled into an apartment complex parking lot, "got out of the car and ran." When officers realized K. H. was in the back of the vehicle, they asked her who she was and "who [the driver] was and why he was running." K. H. responded that she thought she was in an Uber. The last thing she remembered before waking up in the back of the vehicle was being at the bar with M. C.

K. H.'s mother arrived to take her home, but when K. H. realized that her pants were unbuttoned and her underwear was "down in her pants," she told her mother that she needed to go to the hospital. Hospital personnel performed a sexual assault examination of K. H., and male DNA was found on her rectal, vaginal, and cervical

4

swabs. She had scratches and bruises on her thighs that she did not have before that night.

Officers were able to identify Rendon-Villasana as the driver who fled from the SUV from video of the traffic stop, information obtained from the registered owner of the vehicle, and items left in the vehicle. The owner of the SUV explained that she and Rendon-Villasana had a painting business together and that she allowed him to borrow her work vehicle the weekend of October 3, 2015. She explained further that sometime around 3:00 or 4:00 a.m. on October 4, Rendon-Villasana called her and asked her to report the vehicle as stolen.[2]

Detectives made contact with Rendon-Villasana, and a couple days later they obtained his buccal swab. Rendon-Villasana's DNA matched the DNA found in K. H.'s rectal swab and in M. G.'s vaginal/cervical swab.

Rendon-Villasana testified in his own defense that he did not commit the acts charged. But he admitted to being in the Buckhead area the night of both incidents. Rendon-Villasana initially testified that he never saw M. G., but then stated that he could not say that he never spoke to her or touched her because he "was drunk" and

---

[2] Rendon-Villasana admitted this fact at trial and also admitted that he knew the vehicle had not been stolen.

he "do[es] dance and talk to people." When asked, he stated he did not know how his DNA was found in M. G.'s vagina.

Rendon-Villasana explained that he met K. H.'s friend M. C. at a bar, and he asked M. C. if he needed a ride home. Rendon-Villasana admitted that K. H. and M. C. were in his vehicle and that he drove off when M. C. exited the vehicle. He claimed that he did so because when M. C. got ready to open K. H.'s door, K. H. said, "No, let's go . . . I don't live here." Rendon-Villasana stated further that he was en route to take K. H. home when he was stopped by police, and that he fled because he was drunk and did not have a driver's license. When asked if he knew how his DNA was found in K. H.'s rectum, he stated that it was probably from physical contact in the bar. He testified that he danced with K. H. at a bar and that while they were dancing, he lowered the zipper of his pants and K. H. touched his penis. Rendon-Villasana explained further that when someone saw him, he put his penis back in his pants and placed his hands in the back of her pants.

Following the presentation of this evidence, the jury found Rendon-Villasana guilty of kidnapping both victims, the sexual battery and rape of M. G., and aggravated assault with intent to rape K. H. The trial court denied his motion for new trial, and this appeal followed.

1. Rendon-Villasana argues that the trial court erred in denying his motion for a directed verdict.

> The test established in *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979), is the proper test for us to use when a challenge to the sufficiency of the evidence arises from the denial of a motion for directed verdict. Under that test, we view all of the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted.

*Holmes v. State*, 307 Ga. 441, 443 (1) (b) (836 SE2d 97) (2019) (citations omitted).

(a) Rendon-Villasana asserts that the evidence was insufficient to support the kidnapping of the victims, and he points to his testimony that he never had M. G. in his vehicle and did not drive himself on the evening of the alleged encounter with her. He argues further that neither victim testified that they felt they were unable to leave the vehicle freely.

OCGA § 16-5-40 (a) provides that "[a] person commits the offense of kidnapping when such person abducts or steals away another person without lawful authority or warrant and holds such other person against his or her will." With regard to K. H., evidence that Rendon-Villasana drove away before M. C. could help her out

7

of the vehicle, that he fled when stopped by police, and that K. H. was "passed out," was sufficient evidence to establish that Rendon-Villasana kidnapped K. H. See, e.g., *In re D. T.*, 294 Ga. App. 486, 488 (669 SE2d 471) (2008) (evidence sufficient to sustain kidnapping of unconscious victim); *Johnson v. State*, 351 Ga. App. 690, 694 (832 SE2d 676) (2019) (victim unable to consent where "will is temporarily lost" from intoxication or unconsciousness (citation omitted)).

Rendon-Villasana was never identified as the driver who sped away with a sleeping M. G. But the presence of his DNA in M. G.'s sexual assault kit places him at the scene, and K. H.'s kidnapping serves as evidence of his identification as it reveals a common scheme or modus operandi. See *Edwards v. State*, 224 Ga. App. 14, 16 (1) (b) (479 SE2d 754) (1996) (despite victim being unable to identify assailant, evidence of crime committed in similar manner days later revealed common scheme or modus operandi sufficient to convict him of earlier crime); *Shaw v. State*, 211 Ga. App. 647, 648-649 (1) (440 SE2d 245) (1994) (evidence of identity in one burglary was established by modus operandi in other burglaries). Although the crimes here occurred a little more than three months apart, in both instances, Rendon-Villasana pretended to be an Uber driver, stopped just short of the addresses given by the victims' companions, and then sped off with the extremely intoxicated victims

8

(who were either asleep or unconscious) as soon as their companions stepped out of the vehicle. The evidence was therefore sufficient to sustain Rendon-Villasana's conviction for kidnapping M. G. See generally *Edwards*, supra; *Shaw*, supra.

(b) Rendon-Villasana argues that the evidence was insufficient to sustain his conviction for the aggravated assault with intent to rape K. H. He asserts that K. H. had no recollection of him touching her other than disheveled underwear, which could have been disturbed prior to her getting into his vehicle or while she and M. C. were kissing in the back of the vehicle. Rendon-Villasana argues further that because he testified he and K. H. danced at one of the bars and fondled each other, any contact was consensual.

Rendon-Villasana was charged with aggravated assault with intent to rape K. H. by unbuttoning and unzipping her pants and pulling down her underwear with intent to have carnal knowledge of her against her will. The elements of the crime are "(a) an assault against the victim; and (b) aggravation of that assault by an intention to rape the victim." *Goodall v. State*, 277 Ga. App. 600, 602 (1) (a) (627 SE2d 183) (2006); see also OCGA §§ 16-5-21 (b) (1) (2015) (a person commits the offense of

9

aggravated assault when he assaults with intent to rape).[3] "Intent to rape is a jury question. It need not be declared expressly but may be inferred by the jury from the circumstances of the case. As a general rule, proof of intent is shown by circumstantial evidence." *Goodall*, supra at 602-603 (1) (a).

Rendon-Villasana admitted that K. H. was in his vehicle. And evidence that he drove away with an intoxicated and "passed out" K. H. as soon as her companion stepped out of the vehicle, that when he was stopped by police, K. H.'s pants were unbuttoned, her underwear had been pulled down, and she had bruising on her thighs, and that his DNA was found on K. H.'s rectal swab, was sufficient to establish that he assaulted K. H. with intent to rape her. See, e.g., id. at 603 (1) (a). While Rendon-Villasana asserts that his DNA was likely transferred to K. H. during dancing and consentual fondling, we do not weigh the evidence nor do we decide witness credibility. *Turbeville v. State*, 268 Ga. App. 88, 88 (601 SE2d 461) (2004). "So long as there is some competent evidence to support each fact necessary to make out the State's case, even if contradicted, the jury's verdict will be upheld." *Johnson v. State*, 304 Ga. 610, 612 (1) (b) (820 SE2d 690) (2018).

---

[3] Relevant here, assault is defined as an attempt "to commit a violent injury to the person of another[.]" OCGA § 16-5-20 (a) (1).

(c) Finally, Rendon-Villasana argues that there was no evidence that he had intercourse with M. G. to support the rape conviction. OCGA § 16-6-1 (a) (1) provides that a person commits rape when he "has carnal knowledge of . . . [a] female forcibly and against her will[.]" Further, "[e]vidence other than the victim's identification of her attacker, including circumstantial evidence, may sustain a conviction for rape." *Glaze v. State*, 317 Ga. App. 679, 681 (1) (732 SE2d 771) (2012) (citations and punctuation omitted).

As we explained in Division (1) (a), the evidence was sufficient to establish that Rendon-Villasana was the driver of the vehicle in the incident involving M. G. And evidence that Rendon-Villasana drove away with a highly intoxicated and sleeping M. G. as soon as her companion stepped out the vehicle, the presence of Rendon-Villasana's DNA on M. G.'s vagina and cervix, which the expert concluded came from semen, and evidence that the tampon she was wearing had been removed, was sufficient to show that Rendon-Villasana had sexual intercourse with M. G. See, e.g., *Bester v. State*, 294 Ga. 195, 195-196 (1) (751 SE2d 360) (2013) (evidence that defendant's DNA was found in deceased victim's rectum and his personal items were found at the scene of the crime was sufficient to support sodomy conviction); *McKeehan v. State*, 274 Ga. App. 14, 15 (1) (616 SE2d 489) (2005) (appellant argued

11

he was never positively identified as the perpetrator, but evidence that his DNA was in the victim's rape kit and that he matched the description of someone in the area at the time of the attack was sufficient to sustain conviction for rape).

Moreover, M. G. was unable to consent to physical contact because she was highly intoxicated and asleep. Thus, the force necessary to establish rape "is found in the constructive force." See, e.g., *Cook v. State*, 338 Ga. App. 489, 491-492 (1) (790 SE2d 283) (2016) (when victim is physically or mentally unable to give consent because she is intoxicated, force is found in constructive force; where evidence showed that victim was in and out of consciousness when defendant had sexual intercourse with her was sufficient to establish constructive force). The evidence as to rape was sufficient.[4]

2. Rendon-Villasana argues that his trial counsel was ineffective in failing to request funds to obtain an expert witness to challenge the DNA evidence "in terms of its accuracy and mechanisms for transfer." To prevail on a claim of ineffective assistance of counsel, Rendon-Villasana must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to him. *Strickland*

---

[4] Rendon-Villasana's sufficiency argument with respect to sexual battery is moot as that verdict was merged into the rape verdict. See *Doricien v. State*, 310 Ga. 652, 655 (1) n.4 (853 SE2d 120) (2020).

12

*v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984); *Middlebrooks v. State*, 310 Ga. 748, 751 (3) (854 SE2d 503) (2021).

Rendon-Villasana asserts that an independent forensic DNA expert could have testified about other testing methodology that could have been used for a "more accurate and definitive DNA match." But whether to call an expert is a matter of trial strategy, see *Glaze*, supra at 682 (2), and counsel testified at the hearing on the motion for new trial that he did not request funds for an expert because he feared an expert would have agreed with the State's evidence and been "risky" for Rendon-Villasana, and that he had no reason to believe the State's DNA evidence was defective or false. Rendon-Villasana did not produce an expert at the hearing on the motion for new trial and has otherwise "failed to show that an expert would have identified any inadequacies in the [S]tate's DNA evidence. Unfounded speculation does not add up to a showing of professionally deficient performance by trial counsel." *Pyburn v. State*, 301 Ga. App. 372, 376 (2) (b) (687 SE2d 909) (2009) (citation, punctuation, and footnote omitted). Moreover, the DNA evidence was not sole link between Rendon-Villasana and the crimes at issue. See id.

Under these circumstances, Rendon-Villasana has not shown that counsel's failure to request funds for a DNA expert was deficient performance. See id.; *Lanier*

*v. State*, 288 Ga. 109, 111 (3) (a) (702 SE2d 141) (2010) (no showing that counsel performed deficiently in failing to hire expert where defendant presented only unfounded speculation as to potential for a different DNA test result than what was introduced by the State at trial). Nor has he established that the outcome of the trial would have been different had counsel obtained an expert. *Lupoe v. State*, 300 Ga. 233, 246 (9) (794 SE2d 67) (2016) (at the hearing on the motion for new trial, defendant did not present any evidence as to what additional information a DNA expert would have offered or how that evidence would have improved his position); *Barstad v. State*, 329 Ga. App. 214, 219-220 (3) (764 SE2d 453) (2014) (defendant failed to show that a DNA expert would have yielded a different result). Rendon-Villasana's ineffective assistance claim therefore fails. *Lupoe*, supra; *Lanier*, supra.

*Judgment affirmed. Dillard, P. J., and Colvin, J., concur*.

14